# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

Defenders of Wildlife, American Lands
Alliance, Animal Protection Institute, Center
for Biological Diversity, Friends of Animals
and Their Environment ("FATE"), Help Our
Wolves Live ("HOWL"), The Humane Society
of the United States, Indigenous
Environmental Network, Klamath Forest
Alliance, Minnesota Wolf Alliance,
RESTORE: The North Woods, and the
Wildlands Project,

       Plaintiffs,

v.

Gale Norton, Secretary of the Interior, United
States Department of the Interior, Matthew J.
Hogan, Acting Director of the United States
Fish and Wildlife Service, and United States
Fish and Wildlife Service,

       Defendants.

**Civ. File No: 1:05CV-01573-ESH**

---

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
## ORAL ARGUMENT REQUESTED

Plaintiffs hereby move the Court for a preliminary injunction preventing the taking of

gray wolves by the Michigan or Wisconsin Department of Natural Resources under the

respective authority of Permits No. 05-05 or Permit No. 05-03 A1, issued by the United

States Fish and Wildlife Service ("FWS"). The grounds for Plaintiffs' motion are as follows:

    1.      The FWS issued "take" permits under Section 10(a)(1)(A) of the
Endangered Species Act ("ESA"), 16 U.S.C. § 1539(a)(1)(A), without
providing notice of its receipt of applications for such permits nor
opportunity for public comment, an explicit violation of ESA Section
10(c), 16 U.S.C. § 1539(c). The FWS's failure to comply with the

procedural mandates of the ESA is also a violation of Section 706(2) of the Administrative Procedure Act, 5 U.S.C. § 706(2).

2.      Absent a preliminary injunction, gray wolves will be unlawfully killed or injured, resulting in irreparable injury to the plaintiffs and their members who observe and enjoy these wolves in the wild.

3.      No cognizable harm to the FWS will result from the issuance of an injunction enforcing the status quo and preventing the taking of wolves for depredation control.

4.      An injunction restoring the statutory protection of an endangered species and preventing gray wolves from being unlawfully killed under the authority of an improperly issued permit is in the public interest.

This motion is supported by the Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction; the Declarations of Tom Herschelman, Nancy Warren, Alvin Warren, Julius Zelazny, and Alan Sanders; the Exhibits submitted with the Plaintiffs' Memorandum In Support Of Motion For Preliminary Injunction; and arguments of counsel. A proposed Order is submitted herewith.

Respectfully Submitted,

Dated: August 24, 2005

/s/ _____

Jason C. Rylander, DC # 474995
**Defenders of Wildlife**
1130 Seventeenth Street, NW
Washington, D.C. 20036-4604
jrylander@defenders.org
(202) 682-9400

Brian B. O'Neill, MN # 82521
boneill@faegre.com
Richard A. Duncan, MN # 192983
rduncan@faegre.com
Elizabeth H. Schmiesing, MN # 229258
eschmiesing@faegre.com
Colette B. Routel, MN # 0313336
croutel@faegre.com

-2-

Sanne H. Knudsen, MN # 0344552
sknudsen@faegre.com
**FAEGRE & BENSON LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)

Attorneys for Plaintiffs Defenders of Wildlife,
American Lands Alliance, Animal Protection
Institute, Center for Biological Diversity,
Friends of Animals and Their Environment
("FATE"), Help Our Wolves Live ("HOWL"),
The Humane Society of the United States,
Indigenous Environmental Network, Klamath
Forest Alliance, Minnesota Wolf Alliance,
RESTORE: The North Woods, Wildlands
Project.

M1:1228107.01

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

Defenders of Wildlife, American Lands
Alliance, Animal Protection Institute, Center
for Biological Diversity, Friends of Animals
and Their Environment ("FATE"), Help Our
Wolves Live ("HOWL"), The Humane
Society of the United States, Indigenous
Environmental Network, Klamath Forest
Alliance, Minnesota Wolf Alliance,
RESTORE: The North Woods, and the
Wildlands Project,

                    **Civil No. 1:05CV-01573-ESH**

                Plaintiffs,

vs.

Gale Norton, Secretary of the Interior, United
States Department of the Interior, Matthew J.
Hogan, Acting Director of the United States
Fish and Wildlife Service, and United States
Fish and Wildlife Service,

                Defendants.

## PLAINTIFFS' MEMORANDUM IN SUPPORT
## OF MOTION FOR PRELIMINARY INJUNCTION

### ORAL ARGUMENT REQUESTED

## INTRODUCTION

Under authority delegated by the Secretary of the U.S. Department of the Interior, the United States Fish and Wildlife Service ("FWS") unlawfully issued permits authorizing the Michigan Department of Natural Resources ("Michigan DNR") and the Wisconsin Department of Natural Resources ("Wisconsin DNR") to kill gray wolves for the purposes of depredation control. The issuance of these permits violates the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA").

The permits were issued under ESA Section 10(a)(1)(A), which allows the FWS to authorize the taking of endangered species "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A). By authorizing lethal taking for the purpose of depredation control under ESA Section 10(a)(1)(A), the FWS dramatically expands a narrow exception to the ESA's otherwise strict prohibition against killing, harassing, or harming endangered species. Despite the FWS's expansive application of the Section 10(a)(1)(A) exception, the FWS issued the Section 10(a)(1)(A) permits to the Michigan and Wisconsin DNRs without adhering to any of the procedural safeguards mandated by the ESA. Contrary to the mandates of ESA Section 10(c), 16 U.S.C. § 1539(c), the FWS did not provide any notice or opportunity to comment before issuing Section 10(a)(1)(A) permits to the Michigan and Wisconsin DNRs. Indeed, in this case it is difficult to say which of the FWS's actions is more egregious – creating a loophole by which court-enjoined depredation control programs can be applied to endangered as well as threatened species, or doing so unilaterally despite the known public interest and controversy that such a decision would generate.

Because the FWS has blatantly abdicated its obligation to provide notice and comment before issuing Section 10(a)(1)(A) permits, and because the unlawfully issued Section

10(a)(1)(A) permits will result in the killing of an endangered species, Plaintiffs – a group of

environmental organizations with an interest in wolf conservation and recovery – filed a civil

action on August 4, 2005, challenging the FWS's decision under the APA. Plaintiffs now submit

this memorandum in support of their motion for a preliminary injunction, and request that the

Court preserve the status quo while the merits of this action are litigated. Absent a preliminary

injunction, Plaintiffs will suffer irreparable injury and endangered species will be unlawfully

killed to the detriment of the public interest.

## STATEMENT OF FACTS

### FWS Attempts to Reclassify the Wolf as a Threatened Species in 2003

On March 9, 1978, the gray wolf (*Canis lupus*) was listed as an endangered species

throughout the coterminous United States and Mexico, with the exception of Minnesota where

the gray wolf was classified as threatened. See Final Rule to Reclassify and Remove the Gray

Wolf From the List of Endangered and Threatened Wildlife in Portions of the Coterminous

United States ("April 2003 Final Rule"), 68 Fed. Reg. 15804, 15806 (April 1, 2003).

On April 1, 2003, the FWS reduced the protection afforded to the gray wolf under the

ESA by reclassifying the status of the wolf from endangered to threatened. See April 2003 Final

Rule, 68 Fed. Reg. 15804. By reclassifying the wolf, the FWS gained authority under Section

4(d) of the ESA to promulgate regulations "necessary and advisable to provide for the

conservation of the [wolf]." 16 U.S.C. § 1533(d). Because Section 4(d) applies only to

threatened species, reclassifying the wolf from an endangered to a threatened species was

necessary for the FWS to acquire the authority to implement regulations under Section 4(d).

By obtaining the ability to establish Section 4(d) regulations, the FWS acquired broader authority to institute more aggressive wolf depredation control programs.[1]  See Defenders of Wildlife v. Norton, 354 F. Supp. 2d 1156, 1159-60 (D. Or. 2005); April 2003 Final Rule, 68 Fed. Reg. at 15863-68.  The Section 4(d) regulations that the FWS implemented as part of the April 2003 Final Rule authorized "the full spectrum of depredation control actions, from nonlethal opportunistic harassment to lethal control of depredating wolves."  See April 2003 Final Rule, 68 Fed. Reg. at 15868.  Such authorization was given to state and tribal authorities, as well as private parties.  Landowners, for instance, were allowed to kill wolves seen attacking livestock. See 68 Fed. Reg. at 15804, 15868.  The rules specifically allowed the killing of any wolf within one mile of a depredation site in Wisconsin and Michigan. See 68 Fed. Reg. at 15864.  "[A]ll of [these] activities, which are 'takes' under the ESA, would be prohibited if the wolf retained its endangered status."  Defenders of Wildlife, 354 F. Supp. 2d at 1160 n.3.

**Court Invalidates April 2003 Final Rule and Enjoins Section 4(d) Regulations**

A group of environmental organizations, including Plaintiffs in this action, challenged the April 2003 Final Rule on the grounds that it violated the ESA, its implementing regulations, and the APA.  See Defenders of Wildlife, 354 F. Supp. 2d at 1156.  The court agreed, holding that the April 2003 Final Rule violated the ESA and enjoining the FWS from implementing the Section 4(d) rules.  Id. at 1174.  In doing so, the court recognized that "the [Section] 4(d) rules in the Final Rule permit lethal and non-lethal harm to the gray wolf.  The death or injury of endangered wolves due to the [Section] 4(d) rules is irreparable injury."  Id.

---

[1] In the past, the FWS used Section 4(d) as means of implementing depredation control programs in Minnesota.  See 50 C.F.R. 17.40(d)(2) (Minnesota Section 4(d) regulations).

As a result of the <u>Defenders of Wildlife</u> decision, the wolf regained its rightful status as an "endangered species" and the FWS lost its authority to implement depredation abatement programs under Section 4(d). Without that authority, the FWS's management options for controlling depredating endangered wolves are limited to the methods available before the attempted reclassification, which the FWS has acknowledged are "severely restricted by general prohibitions under the Endangered Species Act."[2] <u>See</u> Exhibit A, Biological Opinion for Issuance of Section 10(a)(1)(A) Permit to the Michigan Department of Natural Resources, dated April 14, 2005, ("Michigan BiOp"), attached to Affidavit of Sanne H. Knudsen ("Knudsen Aff."), filed herewith, at A-4. In particular, depredating wolves in states such as Michigan and Wisconsin have historically been controlled by non-injurious hazing, or by live-trapping and relocation. <u>See</u> Michigan BiOP, Exh. A to Knudsen Aff. at A-4. <u>See also</u> Exhibit B, Biological Opinion for Issuance of Section 10(a)(1)(A) Permit to the Wisconsin Department of Natural Resources, dated March 25, 2005, ("Wisconsin BiOp"), attached to Knudsen Aff. at B-11.

**<u>Wisconsin and Michigan Request Take Permits Under ESA Section 10(a)(1)(A)</u>**

Given the invalidation of the April 2003 Final Rule, state authorities such as Wisconsin DNR and Michigan DNR were no longer authorized to take depredating wolves by lethal means. <u>See</u> Wisconsin BiOp, Exh. B to Knudsen Aff. at B-6; Michigan BiOp, Exh. A to Knudsen Aff. at A-5. As a result, on February 11, 2005, Wisconsin DNR submitted a permit application to the FWS requesting authority to use lethal and non-lethal force to control depredating wolves in Wisconsin. <u>See</u> Memorandum dated March 17, 2005, from Ron Refsnider, Region 3 Listing

---

[2] The ESA places broad and strict prohibitions on taking any endangered species, 16 U.S.C. § 1538. The term "take" is itself broadly defined to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

Coordinator & Wolf Recovery Coordinator, to TJ Miller, Region 3 Endangered Species Program Manager ("Wisconsin Memo"), attached as Exhibit C to Knudsen Aff., at C-1. The application was submitted under ESA Section 10(a)(1)(A), which allows the issuance of permits to take endangered species "for scientific purposes or to enhance the propagation or survival or the affected species." 16 U.S.C. § 1539(a)(1)(A). Similarly, on February 22, 2005, Michigan DNR submitted a permit application to the FWS pursuant to ESA Section 10(a)(1)(A) requesting authority to use lethal and non-lethal force to control depredating wolves in Michigan. See Memorandum dated April 14, 2005, from Ron Refsnider, Region 3 Listing Coordinator & Wolf Recovery Coordinator, to TJ Miller, Region 3 Endangered Species Program Manager ("Michigan Memo"), attached as Exhibit D to Knudsen Aff., at D-1.

Internal memoranda by the FWS fully acknowledge that the Section 10(a)(1)(A) permits requests are a direct response to the invalidation of the Section 4(d) rules by Defenders of Wildlife. See Michigan Memo attached as Exhibit D to Knudsen Aff., at D-1 (stating that the Michigan DNR permit request "clearly resulted from the January 31, 2005, ruling by the U.S. District Court for the District of Oregon that vacated the Service's April 1, 2003, reclassification of Michigan wolves from endangered to threatened status"). See also Wisconsin Memo, attached as Exhibit C to Knudsen Aff., at C-1 (same).

Further, these memoranda make clear the Section 10(a)(1)(A) permit authority is being used as a backdoor way of continuing the depredation control activities that were enjoined by Defenders of Wildlife. For instance, in analyzing the issuance of a Section 10(a)(1)(A) permit to Wisconsin DNR, the FWS recognized that "the depredation control that would be carried out by [Wisconsin] DNR . . . is identical in scope and methodology to that which has been carried out through January 2005 . . . under the 2003 special regulations under ESA section 4(d)."

Wisconsin Memo, Exh. C to Knudsen Aff., at C-6.  Similarly, in addressing Michgan DNR's request for a Section 10(a)(1)(A) permit, the FWS explicitly stated that "this program is a continuation of the depredation control program carried out for the last two years under the 2003 section 4(d) special regulations." Michigan Memo, Exh. D to Knudsen Aff., at D-6.

In addition to addressing the Wisconsin and Michigan permit requests through internal memoranda, the FWS authored Biological Opinions in accordance with ESA Section 7, 16 U.S.C. § 1536, to analyze the potential impact of granting the Section 10(a)(1)(A) permits to Wisconsin and Michigan.  See Michigan BiOp, Exh. A to Knudsen Aff.; Wisconsin BiOp, Exh. B to Knudsen Aff.  Like the Michigan Memo and Wisconsin Memo, the Michigan BiOp recognizes that the Section 10(a)(1)(A) permits are a means of implementing depredation programs similar to those enjoined by Defenders of Wildlife:

> On January 31, 2005, a United States District Court in Oregon enjoined and vacated the [FWS's] Final Reclassification Rule of April 2003.  The ruling effectively returned the wolves in Michigan to endangered status and cancelled the 4(d) rule. After learning of the court ruling, the [FWS] advised [Michigan] DNR that the 4(d) rule was no longer valid and advised [Michigan] DNR to cease any lethal wolf control activities.  The [Michigan] DNR applied for a 10(a)(1)(A) permit, which is the subject of this consultation, to again obtain authority to lethally control depredating wolves.  The [Michigan] DNR's wolf depredation abatement program which would be conducted via a section 10(a)(1)(A) sub-permit is similar to the program which was initiated under the 4(d) rule.

See Michigan BiOp, Exh. A to Knudsen Aff. at A-5.  See also, Wisconsin BiOp, Exhibit B to Knudsen Aff., at B-6 (recognizing that Wisconsin DNR submitted its permit request because the "U.S. District Court in Oregon vacated the final reclassification and section 4(d) regulations, which resulted in the loss of Wisconsin DNR authority to lethally take wolves in response to depredation complaints").

**Requirement to Provide Notice and Opportunity to Comment**

Before issuing a permit under Section 10(a)(1)(A), the FWS is required to publish notice

of the permit request in the Federal Register. See 16 U.S.C. § 1539(c). In addition, the FWS

must make available for public review all materials that accompanied the Section 10(a)(1)(A)

permit request and provide an opportunity for public comment. See 16 U.S.C. § 1539(c).

**FWS Issues Section 10(a)(1)(A) Permits to Wisconsin and Michigan**

On April 1, 2005, the FWS issued a Section 10(a)(1)(A) permit to Wisconsin DNR to

take gray wolves while conducting certain activities involving scientific research, enhancement

of propagation, or enhancement of survival. See Authorization to Use Region 3 Endangered and

Threatened Species Permit to Carry Out the Following Activities Within the State(s) of

Wisconsin ("Wisconsin Permit"), attached hereto as Exh. E to Knudsen Aff. The Wisconsin

Permit authorizes Wisconsin DNR to take up to 34 wolves during 2005 for depredation control.

See Wisconsin Permit, Exh. E to Knudsen Aff. at E-1.

The taking of depredating wolves under the Wisconsin Permit is subject to certain

conditions, including: (1) the depredation must have occurred within the calendar year, (2) the

depredation must have occurred on lawfully present livestock, (3) prior to taking, the individuals

named on the permit must determine that the depredation was likely caused by a gray wolf, (4)

depredation at the site must be likely to continue in the immediate future, (5) the taking must be

performed in a humane manner, (6) the taking must occur within a half mile of the depredation

site, and (7) pups of the year captured before August 1 must be released near the capture site.

See Wisconsin Permit, Exh. E to Knudsen Aff. at E-1 to E-2.

Similarly, on April 19, 2005, the FWS issued a Section 10(a)(1)(A) permit to Michigan

DNR. See Authorization to Use Region 3 Endangered and Threatened Species Permit to Carry

8

Out the Following Activities Within the State(s) of Michigan ("Michigan Permit"), attached hereto as Exh. F to Knudsen Aff. The Michigan Permit authorizes Michigan DNR to take up to 20 wolves during 2005 for depredation control. See Michigan Permit, Exh. F to Knudsen Aff. at F-1. Like the Wisconsin Permit, the Michigan permit also places certain conditions on the taking of depredating wolves under the permit.

**FWS Provides No Notice or Opportunity to Comment**

Prior to issuing the Section 10(a)(1)(A) permits, the FWS did not publish any notice in the Federal Register acknowledging the receipt of applications for such permits from Wisconsin DNR or Michigan DNR. In addition, the FWS did not provide any opportunity for public comment on the issuance of the permits to Wisconsin and Michigan, or on FWS's ability to authorize the lethal taking of depredating wolves under the narrow take exception provided in Section 10(a)(1)(A).

## ARGUMENT

Courts in the jurisdiction of the United States Court of Appeals for the District of Columbia apply a traditional four-part test in determining whether to issue a preliminary injunction. American Rivers v. U.S. Army Corps of Eng'rs, 271 F. Supp. 2d 230, 248 (D.D.C. 2003). Under the test, Plaintiffs must demonstrate: (1) that there is a substantial likelihood of success on the merits; (2) that Plaintiffs would suffer irreparable injury if the injunction is not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the injunction is in the public interest. Id. Because the Michigan and Wisconsin Permits were unlawfully issued, because issuance of those permits will cause irreparable harm, because Defendants will suffer minimal harm should an injunction be issued, and because preventing the

unlawful killing of endangered species is in the public interest, this Court should grant injunctive relief preventing the taking of any wolves under the Wisconsin Permit and the Michigan Permit.

## I.    PLAINTIFFS WILL SUCCEED ON THE MERITS

### a.    The Defendants Violated the Procedural Requirements of ESA Section 10(c)

Section 10(c) of the ESA unambiguously requires the FWS to provide notice and opportunity to comment whenever the FWS receives a request for a Section 10 take permit:

> The Secretary shall publish notice in the Federal Register of each application for an exemption or permit which is made under this section. Each notice shall invite the submission from interested parties, within thirty days after the date of the notice, or written data, views, or arguments with respect to the application . . . . Information received by the Secretary as a part of any application shall be available to the public as matter of public record at every stage of the proceeding. 16 U.S.C. § 1539(c).

On April 1, 2005, the FWS issued a Section 10(a)(1)(A) permit to the Wisconsin DNR authorizing the lethal and non-lethal take of depredating wolves. On April 19, 2005, the FWS issued an almost identical Section 10(a)(1)(A) permit to the Michigan DNR. Contrary to the mandates of ESA Section 10(c), the FWS did not publish any notice in the Federal Register indicating that the Wisconsin or Michigan DNRs had submitted applications for Section 10 permits. Nor did FWS provide any opportunity for comment prior to issuing these permits. Nor did the FWS make available for public inspection any of the materials accompanying the applications submitted by the Wisconsin or Michigan DNRs.

As a result of the FWS's blatant failures to comply with the mandatory, nondiscretionary procedural requirements of ESA Section 10(c), Plaintiffs will succeed on the merits in proving a violation of the ESA and APA in this case. See Gerber v. Norton, 294 F.3d 173 (D.C. Cir. 2002). In Gerber, a developer submitted an application to the FWS for an incidental take permit

under ESA Section 10(a)(1)(B), requesting permission to take fox squirrels during a residential development project. 294 F.3d at 175-76. As required by 10(c), the FWS published notice in the Federal Register announcing receipt of the application and making some of the documents accompanying the application available for public inspection. Id. at 177. The FWS failed, however, to make available for inspection a map of an off-site conservation easement that would allegedly mitigate the adverse affects of the authorized takings. Id. The plaintiffs challenged the FWS's issuance of an incidental take permit without allowing public comment on a key component of the developer's permit application. Id. at 178. After concluding that the map was indispensable if the plaintiffs were to have a meaningful opportunity to comment, the court held that the FWS violated the procedural requirements of Section 10(c) by failing to make the complete application available to the public. Id. at 182.

In light of Gerber, wherein the Court of Appeals for the District of Columbia concluded that the FWS violated Section 10(c) by failing to make a single document available for comment, Plaintiffs are likely to succeed on the merits of this case, where the FWS has failed to comply with every aspect of Section 10(c) – the FWS has failed to provide notice, failed to make available all materials accompanying the permit requests, and failed to provided any opportunity to comment.

The FWS's failure to comply with the procedural requirements of Section 10(c) violates the APA because the Wisconsin and Michigan Permits were issued "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), and "otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). See Gerber, 294 F.3d at 186. Plaintiffs will therefore succeed on the merits of their APA challenge to the FWS's issuance of the Wisconsin and Michigan Permits.

11

**b.     The Defendants' Violations Were Prejudicial to Plaintiffs**

Defendants' failure to comply with the procedural requirements of ESA Section 10(c) resulted in prejudicial error. "To show that error was prejudicial, a plaintiff must indicate with reasonable specificity what portions of the documents it objects to and how it might have responded if given the opportunity." Gerber, 294 F.3d at 182 (internal quotation marks omitted).

In Gerber, the court determined that the plaintiffs had been prejudiced by the lack of opportunity to comment on a single document withheld from public availability. 294 F.3d at 184. Far beyond the prejudice caused by the procedural violations in Gerber, Plaintiffs in this case were deprived of the opportunity to raise any challenges prior to the issuance of the Michigan and Wisconsin Permits. Despite the fact that the opportunity to comment is designed to further scientific research and benefit the species in question, Plaintiffs were not given an opportunity to provide any comments whatsoever. Had they been given the opportunity to comment, Plaintiffs would have submitted comments addressing the legitimacy of using Section 10(a)(1)(A) to implement wolf depredation abatement programs. See Declaration of Nancy Warren ("Warren Decl.") at ¶ 8; Declaration of Tom Herschelman ("Herschelman Decl.") at ¶ 9. Plaintiffs would also have commented that the very same depredation control provisions in the Wisconsin and Michigan Permits had been invalidated by Defenders of Wildlife v. Norton, 354 F. Supp. 2d 1156 (D. Or. 2005). Further, Plaintiffs would have addressed not only the propriety but also the necessity of using lethal means to manage endangered wolves in Michigan and Wisconsin.

Section 10(a)(1)(A) provides only a narrow exception to take endangered species "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A). By using this narrow exception to implement depredation control programs

that have otherwise only been applied to threatened species, the FWS expands the scope of take permits authorized by Section 10(a)(1)(A). Before the FWS unilaterally expands the scope of taking of endangered species permitted under the ESA well beyond that intended by Congress, some meaningful opportunity for public comment is required at the very least. Indeed, Congress recognized the importance of public comment in response to take permits when it provided the procedural requirements of ESA Section 10(c). See House Consideration and Passage of S. 10229, reprinted in A Legislative History of the Endangered Species Act of 1973, as Amended in 1976, 1977, 1978, 1979, and 1980 at 556 (1982) (noting that the language in 10(c) was changed from subsection to section, which "clarifies the intent of the notice and review requirements to apply to all applications for an exemption or permit") (emphasis added). See also 1973 U.S.C.C.A.N. 2989, 2998 (reiterating that "Subsection (c) (Procedure) requires an application, publication of notice, and review before the Secretary may grant a permit under subsection (a) or (b)").

Plaintiffs have also been deprived of submitting comments that would become part of the administrative record and form the basis of any subsequent legal action challenging the propriety of using ESA Section 10(a)(1)(A) to implement depredation abatement programs. Because the prejudices suffered by Plaintiffs in this case are more significant than those in Gerber, wherein the court recognized the prejudicial error resulting from the lack of opportunity to comment, Plaintiffs are likely to succeed on the merits in this case.

## II.    DEFENDANTS' ACTIONS WILL CAUSE IRREPARABLE INJURY ABSENT AN INJUNCTION

Absent an injunction in this case, wolves in Wisconsin and Michigan will be killed. Because Plaintiffs are actively engaged in the research and observation of wolves in Wisconsin and Michigan, they will suffer concrete aesthetic injury from the taking of wolves under ESA

Section 10(a)(1)(A) permits. That the issuance of the Section 10(a)(1)(A) permits will harm wolves in Wisconsin and Michigan is undisputed. In the Wisconsin BiOp, the FWS fully acknowledged that it "anticipates that issuance of the [S]ection 10(a)(1)(A) subpermit will result in adverse effects to individual wolves." See Wisconsin BiOp, Exh. B to Knudsen Aff. at B-14. See also Michigan BiOp, Exh. A to Knudsen Aff. at A-3 (stating that the proposed action "is likely to adversely affect the gray wolf").

Just as the death of the wolves taken under those permits is final, the injury suffered by Plaintiffs as a result of those deaths is irreparable. See The Fund for Animals v. Espy, 814 F. Supp. 142, 151 (D.D.C. 1993) (issuing injunction and concluding that the aesthetic injury suffered by plaintiffs as a result of a research program involving the capture and slaughter of bison outside of Yellowstone was irreparable); Federation of Japan Salmon Fisheries Coop. Ass'n, 679 F. Supp. 37 (D.D.C. 1987) (holding that irreparable harm would result from the taking of marine mammals under a fishing permit issued in contravention of the Marine Mammal Protection Act); The Fund for Animals v. Turner, C.A. No. 91-2201, 1991 U.S. Dist. LEXIS 13426, *26 (D.D.C. Sept. 27, 1991) (unpublished opinion) (holding, in a case involving threatened species, that "the loss of even of the relatively few grizzly bears that are likely to be taken through a sport hunt . . . is a significant, and undoubtedly irreparable, harm"), attached as Exhibit G to Knudsen Aff.

In Defenders of Wildlife v. Norton, the district court enjoined the Section 4(d) regulations that were issued as part of the April 2003 Final Rule. 354 F. Supp. 2d at 1174. In doing so, the district court explained that an injunction was "necessary because the [Section] 4(d) rules . . . permit lethal and non-lethal harm to the gray wolf." Id. Central to the court's decision

to issue the injunction was the determination that "the death or injury of endangered wolves . . .

is irreparable injury." Id.

The analysis of irreparable harm in this case is not affected by the fact that the Wisconsin

Permit and Michigan Permit authorize the taking of only a finite number of wolves.  In other

cases involving the taking of threatened or endangered species, this Court has recognized that:

> even when there [is] not the remotest possibility that the planned
> agency activity during the period in which a preliminary
> injunction would be in place would eradicate the species, the
> strong congressional mandate contained in the ESA to protect
> endangered and threatened species support[s] the finding that
> the loss of relatively few individuals . . . is a significant and
> undoubtedly irreparable harm.

American Rivers, 271 F. Supp. 2d at 258-59 (internal quotation marks and citation omitted)

(emphasis added).  See also Defenders of Wildlife, 354 F. Supp. 2d at 1174 (rejecting

Defendant's argument that "an injunction is not appropriate because the impact on the gray wolf

is modest").

When, as here, the taking of endangered species is at issue, irreparable harm can only be

avoided by the issuance of an injunction. Id. at 259.  The Supreme Court has recognized that

"environmental injury, by its nature, can seldom be adequately remedied by money damages and

is often permanent or at least of long duration, i.e. irreparable.  If such injury is sufficiently

likely, the balance of harms will usually favor the issuance of an injunction to protect the

environment." Amoco Prod. Co. v. Gambell, 480 U.S. 531 (1987) (quoted in Federation of

Japan Salmon Fisheries Coop. Ass'n, 679 F. Supp. 37, 48 (D.D.C. 1987)).  Here, the taking of

wolves under the Wisconsin Permit and Michigan Permit will cause irreparable harm absent

injunction.

15

### III.    THE BALANCE OF HARMS WEIGHS IN PLAINTIFFS' FAVOR

Because this case involves the taking of endangered species under the ESA, Congress has already "spoken in the plainest of words, making it abundantly clear that it has given the policy of conservation of endangered species the highest of priorities." American Rivers, 271 F. Supp. 2d at 261 (internal quotation marks omitted) (citing Tennessee Valley Authority v. Hill, 437 U.S. 153 (1978)). As such the balance of harms "must be struck in favor of the overwhelming need to devote whatever effort and resources necessary to avoid further diminution of national and worldwide wildlife resources." Id., citing TVA v. Hill, 437 U.S. at 177.

Even setting aside Congress' clear intent to prohibit the taking of endangered species, the balance of harms in this case weigh in Plaintiffs' favor. Absent an injunction, Plaintiffs will suffer irreparable harm caused by the lethal take of endangered wolves. Not only will taking wolves under the unlawfully issued permits cause irreparable injury to the wolves, but such takings will also injure the Plaintiffs, who are deeply committed to and actively involved in promoting wolf recovery in Michigan and Wisconsin through efforts such as education, outreach, and providing input to state agencies regarding wolf management. See Warren Decl. at ¶ 6; Herschelman Decl. at ¶ 9. Taking of wolves in these state pursuant to the Wisconsin Permit and Michigan Permit "lead to the deaths of individual animals, disturb and stress intra-pack relationships, and cause a decline in the area wolf population." See Herschelman Decl. at ¶ 10.

Defendants, however, will not suffer from any cognizable harm if the injunction is issued. Indeed, the only rationale that the FWS has provided for the issuance of the Section 10(a)(1)(A) permits to Wisconsin and Michigan is that "depredation of livestock on private lands by wolves can result in a loss of support for wolf recovery." See Wisconsin BiOp, Exh. B to Knudsen Aff., at B-6. See also Michigan BiOp, Exh. A to Knudsen Aff., at A-4 (stating that wolf depredation

16

control programs are necessary because "[i]f the State or Federal government does not act, livestock owners likely will and their actions could lead to the indiscriminate killing of wolves").

Not only is the FWS's rationale speculative, but there is also no reason to think that any loss of public support resulting from a preliminary injunction would cause greater harm to wolves than killing wolves as authorized by the unlawfully issued Section 10(a)(1)(A) permits. In Fund for Animals v. Turner, this Court rejected a rationale similar to the one advanced by the FWS in this case: the court in Turner rejected the defendants argument that creating a limited hunt of grizzly bears would in the long run promote conservation and recovery of the species by confining bears to their range and reducing bear-human conflicts. 1991 U.S. Dist. LEXIS 13426 at *21.

This Court has issued preliminary injunctions in cases involving a much closer balance of harms than that at issue here. In Fund for Animals v. Espy, this Court addressed whether the harm to plaintiffs' aesthetic interest caused by taking pregnant bison outside of Yellowstone National Park for research purposes was outweighed by the need to obtain valid research regarding brucellosis, a microorganism potentially contaminating cattle in Montana. 814 F. Supp. at 151-52. Even though the court recognized that "brucellosis is a serious problem in Montana," and even though the research would be postponed by at least a year if the injunction were issued, the court issued the preliminary injunction. Id. Unlike here, Espy did not involve challenges to the taking of endangered or threatened species under the ESA, which demands even greater protection of the species through injunctive relief.

## IV.    AN INJUNCTION IS IN THE PUBLIC INTEREST

By enacting the ESA, Congress has already made the determination that prohibiting the taking of endangered species is in the public interest. See TVA v. Hill, 437 U.S. 153, 174 (1978) ("examination of the language, history, and structure of the [ESA] . . . indicates beyond a doubt

17

that Congress intended endangered species to be afforded the highest priorities"); Fund for
Animals v. Turner, 1991 U.S. Dist. LEXIS 13246 at *26 (recognizing that the Supreme Court in
TVA v. Hill "underscores the weight Congress has placed on the protected of endangered and
threatened species"). Cf. Federation of Japan Salmon Fisheries Coop. Ass'n, 679 F. Supp. at 49
(issuing injunction preventing take of marine mammals in accordance with unlawfully issued
permits because Congress, in enacting the Marine Mammal Protection Act, has already
determined that takings are harmful to the environment and that protection is in the public
interest). Given that wolves are endangered species protected under the ESA's strict prohibitions
against takings, there can be little doubt that issuing an injunction to prevent the taking of wolves
under the unlawfully issued Section 10(a)(1)(A) permits is in the public interest.

Issuing a preliminary injunction for the sake of the public interest is even more necessary
in this case, where the FWS utterly failed to provide any opportunity for public involvement in a
decision that the FWS knew would be controversial and strike at the heart of the public's interest
in wolf conservation.

## Conclusion

For the foregoing reasons, this Court should issue a preliminary injunction preventing the taking of any wolves under the Section 10(a)(1)(A) permits issued to the Wisconsin DNR and Michigan DNR.


Dated:  August 24, 2005

/s/
Jason C. Rylander, DC # 474995
**Defenders of Wildlife**
1130 Seventeenth Street, NW
Washington, D.C. 20036-4604
jrylander@defenders.org
(202) 682-9400

Brian B. O'Neill, MN # 82521
boneill@faegre.com
Richard A. Duncan, MN # 192983
rduncan@faegre.com
Elizabeth H. Schmiesing, MN # 229258
eschmiesing@faegre.com
Colette B. Routel, MN # 0313336
croutel@faegre.com
Sanne H. Knudsen, MN # 0344552
sknudsen@faegre.com
**FAEGRE & BENSON LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)

Attorneys for Plaintiffs Defenders of Wildlife, American Lands Alliance, Animal Protection Institute, Center for Biological Diversity, Friends of Animals and Their Environment ("FATE"), Help Our Wolves Live ("HOWL"), The Humane Society of the United States, Indigenous Environmental Network, Klamath Forest Alliance, Minnesota Wolf Alliance, RESTORE: The North Woods, Wildlands Project.

M1:1222822.06