ES/TE

March 17, 2005

## Memorandum

To:        TJ Miller, Region 3 Endangered Species Program Manager

From:      Ron Refsnider, Region 3 Listing Coordinator & Wolf Recovery Coordinator

Subject:   Endangered Species Permit Request from Wisconsin DNR

On February 11, 2005, Wisconsin DNR requested from Region 3 a section 10(a)(1)(A) permit that would authorize various forms of take of gray wolves in Wisconsin. This request resulted from the January 31, 2005, ruling by the U.S. District Court for the District of Oregon that vacated the Service's April 1, 2003, reclassification of Wisconsin wolves from endangered to threatened status. This vacature also terminated the implementation of the section 4(d) special regulations that allowed various forms of take of gray wolves by state and tribal authorities.

Wisconsin DNR requests several forms of take which I have organized into the following three "levels":

### Level 1
Immediate re-issuance of Endangered Species Subpermit 03-05 (under Permit 697830) in order for "the WI DNR to continue conducting research, surveys and control efforts on the gray wolf, Canis lupus, which is now again listed as endangered...." This subpermit was issued by Region 3 on March 3, 2003, and it expired on December 31, 2003. WI DNR did not request its renewal at that time, because Wisconsin wolves were reclassified to federally threatened status on April 1, 2003, and a federal permit was no longer needed by the DNR to carry out these activities.

The previous Subpermit 03-05 included:
- lethal take of up to 8 wolves verified as being involved in repeat depredation incidents (excluding attacks on free roaming dogs and game farm animals)
- lethal take of up to 8 wolves at two specific farms with chronic depredation problems
- the combined lethal take is limited to 12 wolves annually
- Although not specified in the Subpermit, FWS' BO anticipates additional (incidental) mortality of up to 2 wolves that accidentally die, or are seriously injured and require removal from the wild or euthanization. This incidental take could be the result of trapping for radio-tracking or other research activities, as well as from the trapping of pups that would otherwise have been released.
- Thus, the subpermit and BO covered the potential take (mortality or removal from the wild) of up to 14 wolves annually.

### Level 2
WI DNR also requests several modifications to Subpermit 03-05; the most important are:
(a) expansion of lethal control of depredating wolves at farms experiencing chronic wolf depredation:

**Exhibit C-1**

previous limit (condition 10): a maximum of eight wolves may be taken within one-half mile of the James and Marcia Mihalek farm and the James Gadamus farm.

requested change: a maximum of 24 wolves may be taken within one-half mile of farms with chronic wolf depredation (verified depredation in at least 2 of the last 5 years).

(b) add: "Severely injured wolves may be euthanized" up to 4 annually (considered by DNR to be incidental taking).

(c) add: "Wolves showing signs of mange or other serious, contagious disease may be euthanized instead of translocated or relocation." No limit is specified.

**Level 3**
Issuance of a "special, Recovery Permit for Wolf Control Activity in Wisconsin. This special Recovery Permit should authorize all the same activities granted to Wisconsin under the 4d rule listed in the Federal Register on April 1, 2003."

**FWS Actions to Date**
On February 28, 2005, we issued a new subpermit 05-03 to WI DNR that authorized "level 1" take, except that it does not authorize take of up to 8 wolves at two specific chronic farms. Thus, the new subpermit and new BO cover the intentional take of up to 8 wolves and the incidental take of up to 2 wolves. This subpermit authorized WI DNR and their designated agents to resume most of the wolf research and depredation control activities they had been conducting prior to the April 1, 2003, reclassification and 4(d) regulations.

We are currently reviewing the other forms of take that were requested. A new Biological Opinion under section 7 of the ESA is being developed by our Green Bay Field Office to evaluate (1) euthanizing severely injured wolves, (2) euthanizing diseased wolves, and (3) taking wolves under the conditions specified under the 2003 4(d) rule.

We currently are not evaluating the taking of up to 24 wolves at or near farms with a history of chronic depredation (level 2(a)). Depending upon interpretation of this part of the request (that is, whether a verified wolf depredation in the current year is a prerequisite for such take), this form of take is (a) either a subset of the depredation control activities specified under the 2003 4(d) rule (i.e., Level 3 take), or (b) is a form of preventive/proactive lethal depredation control that has not been permitted or carried out in any Midwestern state and would require more detailed review. Conversations with Dave Ruid (USDA-WS; 3/9/05) and Adrian Wydeven (WI DNR; 3/10/05) indicated that this form of take is intended to be a subset of the type of lethal control authorized under the previous 4(d) rule, and that there is no intent to gain authority for preventive/proactive lethal control.

**Evaluation**
As a result of the 22-month period between the finalization of the 2003 4(d) rules and the January 31, 2005, ruling by the Oregon District Court, we have two years of empirical data on the potential impacts of the Level 3 take that is requested by WI DNR.

**Exhibit C-2**

Lethal control of depredating wolves will be limited by several conditions that applied to the 2003 section 4(d) special rules:
- ξ the evidence at the scene is examined and agency officials have determined that the depredation was likely to have been caused by a gray wolf
- ξ depredation is likely to be repeated at the site
- ξ the taking must be performed in a humane manner
- ξ young of the year taken before August 1 must be released rather than killed.

In addition, WI DNR's Depredation Control Guidelines (Wisconsin DNR 2002) which will also constrain lethal control of depredating wolves, are somewhat more restrictive than our previous 4(d) regulations in two ways, which will result in less impact on WI wolves than could have occurred if the 4(d) rules continued to be implemented as finalized in 2003:
- ξ trapping in Wolf Managements Zones 1 and 2 (where nearly all WI wolves occur) will be done within 0.5 miles from the depredation site; our 4(d) rule allowed trapping up to 1 mile from the depredation site.
- ξ lethal control will not be carried out for wolves who have attacked and/or killed free-roaming dogs on public land; the 4(d) rule allowed lethal control of wolves attacking/killing any "lawfully present livestock or domestic animals."

Lethal Depredation Control Since April 1, 2003, under WI DNR Depredation Control Guidelines (data from Wydeven and Wiedenhoeft 2004; Wydeven et al. 2004, 2005; Wydeven pers. comm., 3/10/05)
May 2003 – 4 euthanized by WS for depredation control (3 probably from Riverside Pack, Burnett Cnty;1 from Blue Hills Pack, Barron Cnty.)
June – 0 euthanized
July – 1 euthanized (probably from Riverside Pack)
August – 12 euthanized (11 Bayfield, 1 Taylor County)
Sept.-Dec. – 0 euthanized
Jan.-Mar. 2004 – 0 euthanized
April – 1 euthanized (Long Lake Pack, Rusk Cnty.)
May – 3 euthanized (2 from Bibbon Swamp Pack, Bayfield Cnty; 1 unknown Rusk Cnty. pack)
June – 4 euthanized (1 each from Poplar River Pack, Douglas Cnty.; Poplar River Pack, Douglas Cnty; Blue Hills South Pack, Barron Cnty; and probably Ino Swamp Pack, Bayfield Cnty.)
July – 4 euthanized (Bearsdale Pack, Bayfield Cnty; Oconto River Pack, Oconto Cnty; Bibbon Swamp Pack, Bayfield Cnty; and an unknown pack in Burnett Cnty.)
August – 8 euthanized (3 from Lake Nebagamon Pack, Douglas Cnty; 2 form Blue Hills South Pack, Barron Cnty; 1 from Bibbon Swamp Pack, Bayfield Cnty; 1 from Mondeaux Flowage Pack, Taylor Cnty; and 1 from Moquah Pack, Bayfield Cnty.)
Sept. – 0 euthanized
Oct. – 4 euthanized (all from Long Lake Pack, Rusk Cnty.)
Nov. – Dec. – 0 euthanized
Jan. 2005 – 0 euthanized (lethal control authority under the 4(d) rule ended on 1/31/05)

Summary of Lethal Depredation Control:

**Exhibit C-3**

2003 – 17 euthanized (from May-Dec.; generally depredations don't begin until late April); 8 were pups, so the 9 adults represent **2.7%** of the late winter population of 335 wolves.
2004 – 24 euthanized (Jan.-Dec.); 4 were believed to be pups, so the 20 adults represent **5.4%** of the late winter population of 373 wolves.
2005 – none euthanized during January, the only period in 2005 when lethal control was authorized by the 4(d) rule.

These percentages are slightly higher than the 2 to 3 percent that we predicted in our 2003 Final Reclassification Rule (USFWS 2003). Those earlier predictions were based on Minnesota depredation control data from the early 1980s. The Minnesota depredation situation is different from that in Wisconsin in two important aspects that would result in relatively less need for lethal depredation control actions in Minnesota:

ξ   In the early 1980s Minnesota wolves were largely confined to the highly forested northeastern corner of the state, consisting primarily of public lands with few livestock operations and limited opportunities for wolves to become involved in livestock depredations

ξ   At that time a large percentage of Minnesota wolves resided in Minnesota Wolf Management Zone 1, where all forms of take for depredation control are prohibited.

Because the occupied wolf range of northern Wisconsin is more of a mosaic of farms and forests, and lacks a wolf "sanctuary" comparable to Minnesota Wolf Management Zone 1, it should be expected that depredation control actions in Wisconsin may result in taking a somewhat higher percentage of the winter wolf population than was taken in the years when Minnesota had a relatively small wolf population.

Despite the slightly higher percentage of Wisconsin wolves killed for depredation control, it is clear that this mortality, in combination with other forms of mortality (both natural and human-caused), has not prevented the continued growth of the Wisconsin wolf population. The estimated Wisconsin population has continued to increase annually over the last 11 years, and the preliminary estimate of the 2005 population (Wydeven et al. 2004; pers. comm., March 10, 2005) continues that increase. (The final population estimate for 2005 will not be available until late April or May 2005.)

| Year | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| pop. | 40 | 57 | 83 | 99 | 148 | 180 | 205 | 248 | 257 | 327 | 335 | 373 | 400 |
| % incr. | --- | 42.5 | 56.6 | 12.3 | 49.5 | 21.6 | 13.9 | 21.0 | 3.6 | 27.2 | 2.4 | 11.3 | 7.2 |

At some point wolves will have reoccupied the most suitable habitat areas in Wisconsin; the population growth is expected to slow and eventually cease, and the wolf population will plateau at some unknown level. Due to the variability in a number of demographic and environmental factors, the wolf population will likely bounce above and below that level from year to year once the plateau is reached. The population data from the last three to five years may be showing signs of this plateau effect.

Wisconsin DNR's wolf management plan calls for an off-reservation wolf population of at least 350 wolves (Wisconsin DNR 1999). The Service's Recovery Plan for the Eastern Timber Wolf has a recovery goal of a minimum of 100 wolves in Wisconsin and the Upper Peninsula of

**Exhibit C-4**

Michigan <u>combined</u> for at least five years (USFWS 1992). The Wisconsin wolf population, even with the impacts of two successive years of lethal depredation control, continues to greatly exceed both goals.

<u>Euthanizing Diseased Wolves</u>
Wisconsin DNR also has requested authority to euthanize diseased wolves that have been captured for various reasons. Both mange and canine parvovirus (CPV) have been documented as serious diseases among Wisconsin wolves, and both are believed to have slowed wolf population growth in the State in past years (USFWS 2003, Wisconsin DNR 1999).

The largest cause of death for Wisconsin wolves is winter hypothermia induced by fur loss from severe infestations of sarcoptic mange mites. Over the last five years mange has been the primary cause of death for 26 percent of the radio-collared wolves found dead in Wisconsin (radio-collared wolves provide the least biased data on wolf mortality), ranging from 14 percent of all mortalities in 2002 to 33 percent of mortalities in 2000. Mange is easily spread to other pack members, and wolves with severe cases are likely to die from exposure during winter conditions. Therefore, euthanizing captured wolves with severe cases of mange is not likely to increase wolf mortality, and may actually decrease mange-related mortalities by inhibiting its spread, thus promoting wolf recovery in the State.

Over the last five years severe cases of mange have killed an average of 6.1 percent of Wisconsin's radio-collared wolves, ranging from 2.4 percent in 2002 to 8.2 percent in 2000 (Wydeven in litt. 2005). Based on a capture rate of 31 wolves in 2004 (excluding wolves euthanized at depredation sites), euthanizing 6.1 percent (the expected rate of cases of severe ménage) would result in the deaths of two wolves; euthanizing 8.2 percent (based on the worst year for mange mortalities during the last five years) would result in the deaths of three wolves. Rather than being a form of additional mortality, these are compensatory mortalities, as the wolves likely would have died subsequently if they were released, and may have spread mange to their packmates.

<u>Euthanizing Seriously Injured Wolves</u>
Wisconsin DNR has also requested authority to euthanize seriously injured wolves. Such injuries can result from trapping for research purposes, incidental captures by coyote or other trappers, depredation control trapping of pups who would otherwise be released before August 1, vehicle collisions, fights with other wolves or animals, and other causes. Seriously injured wolves frequently will die if released, due to their inability to capture prey or defend themselves against other wolves. In 2004 there were five such injuries qualifying for euthanization; 4 were the result of vehicle collisions, and the fifth was a wolf found in very poor conditions with a plastic pail stuck on its head (Wydeven et al. 2005). Euthanizing such wolves is also is compensatory mortality, rather than additive to other mortality factors.


**Conclusion**
After evaluating the available data on Wisconsin wolves, I conclude that euthanizing wolves with severe cases of mange (and other highly contagious diseases like CPV) and those with serious injuries will not measurably increase wolf mortality in Wisconsin. To the contrary,

5

**Exhibit C-5**

euthanizing severely diseased wolves may actually decrease disease-caused mortality in wild wolves. I strongly support a permit or subpermit to Wisconsin DNR that authorizes these two forms of take.

Furthermore, data from two years of lethal depredation control in Wisconsin, as well as over 25 years of data from very similar lethal depredation control activities in Minnesota, lead to the inescapable conclusion that such activities have not interfered with the maintenance of viable wolf populations that greatly exceed federal recovery goals for both states. Such depredation control activities are fully supported in the Federal and State recovery plans for gray wolves. Limited lethal depredation control actions of this type, while perhaps disturbing to some people, are supported by years of empirical data that demonstrate their proper place in a comprehensive recovery and management program for gray wolves in the Midwest.

The depredation control take that would be carried out by WI DNR and the State's designated agent, APHIS-Wildlife Services, is identical in scope and methodology to that which has been carried out through January 2005 by Wildlife Services, acting as an agent of the State and carrying out the control of depredating wolves as authorized for the State under the 2003 special regulations under ESA section 4(d). The impacts of that take have been as we predicted in our 2003 final rule (USFWS 2003), and there is no reason to suspect a change in impacts as the depredation control activities are resumed under ESA section 10(a)(1)(A) permit authority.

# References Cited

U.S. Fish and Wildlife Service. 1992. Recovery plan for the eastern timber wolf. Twin Cities, Minnesota. 73 pp.

U.S. Fish and Wildlife Service. 2003. Endangered and threatened wildlife and plants; Final rule to reclassify and remove the gray wolf from the list of endangered and threatened wildlife in portions of the conterminous United States; Establishment of two special regulations for threatened gray wolves; Final and proposed rules. 68 Federal Register 15804-15875.

Wisconsin Department of Natural Resources. 1999. Wisconsin wolf management plan. Madison, Wisconsin. 74 pp.

Wisconsin Department of Natural Resources. 2002. Guidelines for conducting depredation control on wolves in Wisconsin following federal reclassification to "threatened" status. Unpublished. Madison, WI. 5 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.L. Schultz, R.P. Thiel, S.H. Boles, E. Heilhecker, and W.H. Hall, Jr. 2004a. Progress report of wolf population monitoring in Wisconsin for the period October-March 2004. Unpublished report by Wisc. Dept. Natural Resources, Park Falls, WI. 40 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.L. Schultz, R.P. Thiel, W.H. Hall, E. Heilhecker, and J.E. Hawley. 2004b. Progress report of wolf population monitoring in Wisconsin for the period October-March 2004. Unpublished report by Wisc. Dept. Natural Resources, Park Falls, WI. 31 pp.

Wydeven, A.P. and J.E. Wiedenhoeft. 2004. Wisconsin endangered resources report – status of the timber wolf in Wisconsin. Performance report 1 July 2003 through 30 June 2004. Unpublished report by Wisc. Dept. Natural Resources, Park Falls, WI. 30 pp.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, W.H. Hall, E. Heilhecker, and J.E.

**Exhibit C-6**

Hawley.  2005. Progress report of wolf population monitoring in Wisconsin for the period April – September 2004 & annual summaries for 2004.  Unpublished report by Wisc. Dept.  Natural Resources, Park Falls, WI.  28 pp.

**Exhibit C-7**



# United States Department of the Interior

**FISH AND WILDLIFE SERVICE**
Bishop Henry Whipple Federal Building
1 Federal Drive
Fort Snelling, MN 55111-4056

IN REPLY REFER TO:

ES/TE

April 14, 2005

## Memorandum

To:   TJ Miller, Region 3 Endangered Species Program Manager

From:  Ron Refsnider, Region 3 Listing Coordinator & Wolf Recovery Coordinator

Subject:  Endangered Species Permit Request from Michigan Department of Natural Resources

In a February 22, 2005, letter to Regional Director Robyn Thorson and an attached permit application, Mindy Koch, Michigan DNR Resource Management Deputy, requested a permit under ESA section 10(a)(1)(A) "to use harassment and lethal control to respond to wolf-related threats to human safety and domestic animals.... to maintain public support and thereby ensure the long-term recovery of the species." While not specifically discussed in the letter or permit application, this request clearly resulted from the January 31, 2005, ruling by the U.S. District Court for the District of Oregon that vacated the Service's April 1, 2003, reclassification of Michigan wolves from endangered to threatened status. This vacature also ended our ability to implement the section 4(d) special regulations that allowed various forms of take of threatened gray wolves by state and tribal authorities.

The following take authorities were requested by Michigan DNR in the Feb. 22, 2005, application:

**1. Lethal control of wolves – up to 10 percent of the late-winter population – involved in confirmed depredations (injuring or killing) on lawfully present livestock (including livestock guard dogs) or other domestic animals,** under the following conditions:

 a) Wolf depredation must be verified following the procedure described in *Michigan Department of Natural Resources Wildlife Division Procedure: Guidelines for Management and Lethal Control of Wolves Following Confirmed Depredation Events* (version 1.03, 9/03/03).

 b) Depredation is likely to be repeated at the site.

 c) Trapping for the depredating wolf or wolves must occur within 1 mile of the depredation site.

 d) The trapping, handling, and euthanizing must be done in a humane manner.

 e) Traps must be checked at least every 24 hours.

 f) Young of the year trapped before August 1 must be released.

1

**Exhibit D-1**

    g) Lactating females trapped before July 1 must be released near the point of capture unless they have been involved in 3 or more depredations; if so involved, they may be euthanized.

    h) Livestock operations must implement technical assistance guidelines in a timely manner in order to qualify for lethal control efforts.

    i) May not be used to take wolves that kill dogs "that are free-roaming, hunting, or training on public lands."

Note: Conditions 1(a) through 1(d) are nearly identical to those found in our 2003 section 4(d) special regulations for wolves in portions of the Eastern Distinct Population Segment. Conditions 1(e) through 1(i) place additional restrictions on the take actions.

**2. Harass wolves "that pose a threat to humans, livestock and other domestic animals, …."** under the following conditions:

    **a) Injurious harassment** ("cannot be reasonably expected to cause permanent physical damage or death to a wolf") when a wolf (i) attacks or closely approaches livestock or other domestic animals, (ii) has lost its fear of humans, (iii) closely approaches humans, or (iv) closely approaches a human residence three or more times.

    **b) Noninjurious harassment** ("cannot be reasonably expected to cause temporary or permanent physical damage or death to a wolf") in the above situations and when a wolf (i) approaches a human residence or (ii) nears/enters an area occupied by livestock or other domestic animals.

(Note: Much of this would be covered under the "human safety" take regulation that applies with the development sec. 6 cooperative agreements; see below.)

**3. Designate other agencies, tribal governments, organizations, and private individuals as State agents** who are authorized to conduct the take activities under 1 and 2 above, adhering to the conditions outlined for those forms of take. Permittee (Michigan DNR) must inform FWS of any take by designated agents by Jan. 31 of each year.

Correction to Number 3: On March 23, 2005, Todd Hogrefe, Michigan DNR Endangered Species Coordinator, informed us that the permit application previously submitted was in error. He immediately e-mailed the correct version to us. The correct version does not contain the request, under #3, to designated organizations and private individuals to conduct the lethal take activities under #1, but only requests authority to designate organizations and private individuals to conduct the harassment activities described under #2. The corrected #3 contains a request for authorization to designate other agencies and tribal governments to conduct lethal take (#1) and harassment (#2).

**FWS Actions to Date**

On March 10, 2005, we renewed the subpermit to USDA-Wildlife Services in Minnesota to continue their similar program of removing verified depredating wolves in Minnesota Wolf Management Zones 2-5.

**Exhibit D-2**

On February 28, 2005, we issued a new subpermit 05-03 to Wisconsin DNR that authorized nonlethal control (trapping and translocation) of depredating wolves, plus lethal control of up to 8 wolves that are repeat depredators. This subpermit authorized Wisconsin DNR and USDA-Wildlife Services personnel to resume most of the wolf research and depredation control activities as they had been conducted prior to the April 1, 2003, reclassification and 4(d) regulations.

We recently completed a review of other forms of take that were requested by Wisconsin DNR, including take authorities that closely resemble the lethal take authorities of the 2003 section 4(d) special regulation. A new Biological Opinion under section 7 of the ESA was developed by our Green Bay Field Office to evaluate (1) euthanizing severely injured wolves, (2) euthanizing diseased wolves, and (3) taking depredating wolves under the conditions specified in the 2003 4(d) rule. On April 1, 2005, we issued an amended subpermit 05-03A1 for the remainder of 2005 that authorizes the Wisconsin DNR to lethally take 10, 3, and 34 wolves, respectively, as well as the incidental mortality of 4 wolves.

## Evaluation

The requested lethal control of depredating wolves will be limited by several conditions that were contained in the 2003 section 4(d) special rules (USFWS 2003):

- ξ  The evidence at the scene is examined and agency officials have determined that the depredation was likely to have been caused by a gray wolf.
- ξ  Depredation is likely to be repeated at the site.
- ξ  The taking must be performed in a humane manner.
- ξ  Young of the year captured before August 1 must be released rather than killed.

In addition, Michigan DNR's Depredation Management and Control Guidelines (Michigan DNR 2003), which will also constrain lethal control of depredating wolves, are more restrictive than our previous 4(d) regulations in several ways. These additional restrictions will result in less impact on Michigan wolves than could have occurred if the 4(d) rules were implemented as finalized in 2003:

- ξ  Lactating female wolves trapped before July 1 must be released near the point of capture unless they are trapped at a farm with three or more depredation events over two years.
- ξ  Lethal control will not be carried out for wolves who have attacked and/or killed free-roaming dogs on public land; the 4(d) rule allowed lethal control of wolves attacking/killing any "lawfully present livestock or domestic animals."
- ξ  Lethal control will not be used on private lands where the owner fails to follow, in a timely manner, technical assistance guidelines to reduce depredation likelihood.

As a result of the 22-month period between the finalization of the 2003 4(d) rules and the January 31, 2005, ruling by the Oregon District Court, we have two years of empirical data on the impacts of the lethal depredation control that has been requested by Michigan DNR.

Summary of Lethal Depredation Control under the 4(d) Rule:
All were depredations involving livestock, unless otherwise noted (data from Todd Hogrefe, MI DNR, in litt. Feb. 11, 2005).

3

**Exhibit D-3**

2003 – Four adult wolves killed at 2 Mackinac County farms: 1 in August, 3 in September.
2004 – Six wolves killed (3 adults, 3 pups): 3 at 3 farms in Delta, Ontonagon, and Baraga Counties; 1 at a residence (attack on dog); 2 in a Baraga County elk farm. 1 in June, 1 in July, 1 (dog incident) in August, 3 in September (incl. both elk farm wolves)
2005 - None euthanized during January, the only period in 2005 when lethal control was authorized by the 4(d) rule.

The 2003 adult lethal control represented **1.2%** or the 2003 late-winter population, and the 2004 adult lethal control removed **0.8%** of the 2004 late-winter population. These percentages are lower than the 2 to 3 percent that we predicted in our 2003 Final Reclassification Rule (USFWS 2003); those predictions were based on Minnesota depredation control data from the early 1980s when the winter wolf population in Minnesota ranged between 1100 and 1500 animals.

From Michigan DNR wolf population data it is clear that this level of lethal depredation control has not prevented continued growth of the Michigan wolf population. The final population estimate for 2005 will not be available until late April or May 2005, but the population is expected to show a gain since the winter of 2003-2004 and the preliminary estimate is slightly over 400 (Hogrefe, pers. comm. 2005; Lederle, pers. comm. 2005).

| Year | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| pop. | 30 | 57 | 80 | 116 | 112 | 140 | 174 | 216 | 249 | 278 | 321 | 360 | 400* |
| % incr. | --- | 90.0 | 40.4 | 45.0 | -3.4 | 25.0 | 24.3 | 24.1 | 15.3 | 11.6 | 15.5 | 12.1 | 11.1* |

* 2005 estimate is preliminary (Lederle pers. comm., 4/13/05)

Similar lethal depredation control programs have been operating in Minnesota (since 1979) and in Wisconsin (from April 2003 through January 2005). Removal of depredating wolves in Minnesota ranged from less than 2 percent in the early 1980s when the program was in its early years to a maximum of about 9 percent in 1997. Removal rates of Wisconsin depredating wolves in 2003 and 2004 were 2.7 percent and 5.4 percent, respectively, of the late winter population. Both of these programs removed a higher percentage of wolves from the wild population then were removed in Michigan, and the wolf populations continued to increase in number in both states (Erb and Benson 2004, Wydeven et al. 2005, Wydeven pers. comm. 2005).

Combined Michigan and Wisconsin wolf population estimates since 1980 are shown on the attached graph, including winter 2004-2005 estimates from Wydeven (pers. comm. 4/13/05) and Lederle (pers. comm. 4/13/05). The steep population increase seen in both states since 1993 appears to be continuing, including the last 2 years during the two lethal depredation control programs. These wolf populations continue to show the rapid growth rate that is the typical of the middle phase of the "sigmoid growth curve" displayed by species exploiting new habitat where conditions are not limiting their growth. During this phase of rapid growth a species generally is resistant to minor adverse impacts.

Injurious and Noninjurious Harassment
These forms of requested take are limited to actions that are not expected to cause permanent physical damage or death, or actions not expected to cause any physical damage, respectively.

**Exhibit D-4**

Therefore, these forms of take of endangered wildlife are available to the State "conservation agency" under 50 CFR 17.21(c)(5) without requiring a permit from the Service.

Furthermore, 50 CFR 17.21(c)(5) indicates that the State may delegate these take authorities to their "agent," again without a Federal permit. Thus, the State could conduct these take activities, and delegate agents to conduct such activities, without any direct FWS regulation or oversight. Under the provisions of the Section 6 Cooperative Agreement between Michigan DNR and the Service, the annual reporting of such take activities is required.

An advantage of covering these harassment activities under a FWS subpermit is that it allows us to impose additional reporting requirements. Prompt reporting of incidents of injurious harassment, or of incidents of intended noninjurious harassment which result in injuries, would allow us to continually reevaluate the impacts of such actions, and to modify permit conditions if such impacts are greater than previously envisioned or if they no longer promote the conservation of the gray wolf in Michigan. Because MI DNR intends to delegate authority for such harassment actions to other agencies, tribal governments, organizations, and private individuals, tighter reporting requirements should be specified so we can ensure that these actives are not producing undesirable and/or unexpected impacts to the Michigan wolf population.

The injurious and noninjurious harassment activities that Michigan DNR proposes should have no detrimental impact on the State's wolf population. Under the conditions specified by Michigan DNR, such actions "cannot be reasonably expected to cause permanent physical damage or death to a wolf." Harassment actions that that go beyond this limitation and can be expected to result in permanent physical damage or death will be viewed as illegal takings under the ESA and thus are subject to prosecution. Harassment actions that are properly carried out under the specified conditions should result in fewer wolf-human interactions, and decreased exposure of wolves to livestock and other domestic animals. This could lead to a decreased need for lethal depredation control at sites where harassment is carried out, and therefore may result in a greater density of wolves in certain areas.

At some point wolves will reoccupy all suitable habitat areas in the Upper Peninsula; as that occurs the population growth is expected to slow and eventually cease, and the wolf population will plateau at some unknown level. Due to the variability in a number of demographic and environmental factors, the wolf population will likely bounce above and below that level from year to year once the plateau is reached. The Upper Peninsula is estimated to have a biological carrying capacity of over 800 wolves (Mladenoff et al. 1995). However, the Michigan Wolf Management Plan (Michigan DNR 1997) states that a lower "social carrying capacity" is likely to exist at some unknown level. The Michigan wolf management Plan establishes a minimum population goal of 200 wolves for the Upper Peninsula. Therefore, the Upper Peninsula wolf population is likely to be between 200 and 800 animals (late winter count) for the foreseeable future. The Plan does not address the potential for wolves to move to the Lower Peninsula and establish a population there. A small pack of wolves was first documented in the northern portion of the Lower Peninsula in 2004, but winter surveys failed to find sign of additional wolves or evidence that the first pack still exists there.

**Exhibit D-5**

Michigan DNR's wolf management plan calls for an Upper Peninsula wolf population of at least 200 wolves (Michigan DNR 1997). The Service's Recovery Plan for the Eastern Timber Wolf has a recovery goal of a minimum of 100 wolves in Wisconsin and the Upper Peninsula of Michigan <u>combined</u> for at least five years (USFWS 1992). The Michigan wolf population, even with the impacts of two successive years of lethal depredation control, continues to greatly exceed both goals.

The impact of injurious and noninjurious harassment is difficult to assess because incidental take in the form or permanent injury of death is a possibility. In order to estimate the extent and nature of the incidental take, the Service must be knowledgeable of the forms of harassment to be used, and must review the training and oversight to be provided to the harassing individuals. Because Michigan DNR has not provided such information at this time, the impacts of such incidental take will not be evaluated here.

<u>Human Safety Concerns</u>

Ms. Koch's letter explains that the request for these take authorities partially comes from a need "to respond to wolf-related threats to human safety…." However, the Code of Federal Regulations at 50 CFR 17.21(c)(2) provides "any person" with the authority to "take endangered wildlife in defense of his own life of the lives of others. Additionally, 50 CFR(c)(3)(iv) provides the Service, Federal land management agencies, and state conservation agencies the authority to take endangered wildlife to "remove specimens which constitute a demonstrable but nonimmediate threat to human safety…." With these human safety-related forms of take already codified for endangered wolves, I don't find that Michigan DNR's permit application has provided sufficient documentation of human safety concerns to justify injurious and noninjurious harassment, in light of the lack of information on which to assess the incidental impacts of such harassment.

**Conclusion**

After reviewing the available data on Michigan wolves, I conclude that euthanizing depredating wolves under the conditions specified above will promote the conservation of the species in Michigan. It will do so by removing depredating individuals and packs, and greatly reducing the incentive for private individuals to resort to illegal killings to remove perceived problem wolves. Private killing of problem wolves is likely to result in the wrong wolves, and too many wolves, being killed, and may well interfere with wolf recovery. In contrast, a coordinated and limited depredation control program, as described in the Michigan DNR permit application and the Michigan lethal control guidelines (Michigan DNR 2003) will efficiently and precisely remove the problem wolves or packs, while minimizing the impacts to the wolf population in the State. As this program is a continuation of the depredation control program carried out for the last two years under the 2003 section 4(d) special regulations for the Eastern Gray Wolf Distinct Population Segment, I conclude that the Upper Peninsula wolf population's continued growth will not be significantly impacted, and is likely to be enhanced by the removal of up to 5-7 percent of the late winter population. The removal of a higher percentage – ten percent as requested by Michigan – also is not likely to stall population growth, but at this time it's not clear that there is a need to authorize that magnitude of lethal control; I recommend issuing a

subpermit that authorizes only 5 to 7 percent of the late winter population, with the understanding that we will reevaluate a higher level of take if depredation rates prove to be higher than those experienced over the last 2 years.

The extent of incidental impacts resulting from injurious and noninjurious harassment are impossible to assess at this time. Although I believe that harassment has a role in wolf recovery programs, authorizing non-government parties to conduct harassment – especially injurious harassment – must be accompanied by training and careful oversight to minimize the possibility of significant adverse impacts from incidental take. At this point we have insufficient information on the forms of harassment and on the training and oversight by Michigan DNR, and impact assessment is simply not possible. Therefore, at this time I recommend that we do NOT authorize Michigan DNR to designate agents to conduct injurious or noninjurious harassment actions against gray wolves.

I recommend that, consistent with the recently issued subpermit to Wisconsin DNR, we require that all lethal control actions and other wolf mortalities or serious injuries be reported to FWS in 5 days, in addition to the general annual reporting requirements.

## References

Michigan Department of Natural Resources. 1997. Michigan gray wolf recovery and management plan. Lansing, Michigan. 63 pp.

Michigan Department of Natural Resources. 2003. Guidelines for management and lethal control of wolves following confirmed depredation events. Version 1.03, 9/03/2003. Wildlife Division, Lansing, Michigan. 10 pp.

Mladenoff, D.J., T.A. Sickley, R.G. Haight, and A.P. Wydeven. 1995. A regional landscape analysis and prediction of favorable gray wolf habitat in the Northern Great Lakes region. Conserv. Biology 9:279-294.

Paul, W.J. 2004. Wolf depredation on livestock in Minnesota, annual update of statistics – 2003. U.S. Dept. of Agriculture, Animal & Plant Health Inspection Service, Wildlife Services. Grand Rapids, Minnesota. 13 pp.

Sahr, D.P., Wildlife Services. December 12, 2004. Letter to T.J. Miller, USFWS. Subject: Permit Reporting/Renewal. 1 page with attachments.

U.S. Fish and Wildlife Service. 1992. Recovery plan for the eastern timber wolf. Twin Cities, Minnesota. 73 pp.

U.S. Fish and Wildlife Service. 2003. Endangered and threatened wildlife and plants; Final rule to reclassify and remove the gray wolf from the list of endangered and threatened wildlife in portions of the conterminous United States; Establishment of two special regulations for threatened gray wolves; Final and proposed rules. 68 Federal Register 15804-15875.

Wydeven, A.P., J.E. Wiedenhoeft, R.N. Schultz, R.P. Thiel, W.H. Hall, E. Heilhecker, and J.E. Hawley. 2005. Progress report of wolf population monitoring in Wisconsin for the period April – September 2004 & annual summaries for 2004. Unpublished report by Wisc. Dept. Natural Resources, Park Falls, WI. 28 pp.

**Exhibit D-7**



# Wolf Numbers in Wisconsin & Michigan 1972 - 2005
(excluding Isle Royale; 2004-05 estimates are prelimary as of 4/13/05)



**United States Department of the Interior**

**FISH AND WILDLIFE SERVICE**
Bishop Henry Whipple Federal Building
1 Federal Drive
Fort Snelling, MN 55111-4056

IN REPLY REFER TO:

FWS/AES-ESO

| AUTHORIZATION TO USE REGION 3 ENDANGERED AND THREATENED SPECIES PERMIT TO CARRY OUT THE FOLLOWING ACTIVITIES WITHIN THE STATE(S) OF WISCONSIN |
| --- |

**SUBPERMIT NO.  05-03 A1**          **ISSUED**  April 1, 2005

                                    **EXPIRES**  December 31, 2005

**INDIVIDUALS COVERED BY THIS SUBPERMIT:**

WDNR Personnel:  Adrian P. Wydeven (Coordinator), Bruce E. Kohn, Ronald N. Schultz, Richard P. Thiel, Greg Kessler, Shawn Rossler, Tim Van Deelen, Ellen Heilhecker, Todd A. Naas, Bruce R. Bacon, Kenneth W. Jonas, Wayne H. Hall, Thomas M. Gehring, Darby Murphy, and Michele A. Windsor; Ho-Chunk Personnel: Ritchie Brown, Will Quackenbush, Ronald Anwash, and John Blackdeer;  USDA/APHIS/Wildlife Services Personnel: David A. Nelson (State Director), Robert C. Willging (Supervisor for northern WS Districts), John Shivik, Kelly A. Thiel, Chad Q. Alberg, James C. Rollman, Ed W. Zydzik, Walter W. Follis, James Miller, Eric A. Fromm, Jeremy J. Irish, Phil V. Peterson, Barry F. Benson, David Ruid, Charles Lovell, Mike Edwards, Mark Kerr, John Nuce, Mike Petrie, Dan Hirchert, Aaron Freund, John Carbonari, Jim Tharman, Bob Seefeldt, Weston Schmidt, and DeWayne A. Snobl.  Assistants may work under the direct and on-site supervision of named permittees.


**SPECIES COVERED BY THIS SUBPERMIT:**

Gray Wolf   *Canis lupus*

In accordance with Federal Endangered Species Permit PRT-697830, you are authorized to conduct the following take activities on the above species for scientific research, enhancement of propagation, or enhancement of survival. Any activity related to Federally listed threatened or endangered species that is not specifically permitted in this document is prohibited.

The activities allowed under this subpermit and the conditions under which those activities must be conducted, are as follows:


Research, monitoring, and depredation abatement activities

(1)  Trapping, and retrapping, of wolves in number 4, 14, or 7 McBride-Button leg hold traps, CDR 7.5 foot hold, and cable restraints throughout Wisconsin.
(2)  Chemically immobilize and radio-collar adult, yearling, and pup (over 30 pounds) wolves.  Wolves may be fitted with radio-collars or ear tagged, and tracked as needed to successfully resolve complaints or collect data for wolf conservation.
(3)  Collect blood samples, carry out routine non-invasive health assessment procedures, administer standard medications to combat health problems, and affix ear tags to all wolves captured.
(4)  Aerially radio-track radio-tagged wolves at daily to weekly intervals.
(5)  Remove and relocate depredating wolves in response to verified landowner complaints.
(6)  Attach electronic avoidance collars, or similar devices, to condition potentially depredating wolves to avoid livestock facilities.
(7)  A maximum of 34 wolves may be taken in 2005 for depredation control provided:
    7(a)  The depredation has occurred within the calendar year;
    7(b)  The depredation occurred on lawfully present livestock (as defined by the 1999 Wisconsin Wolf Management Plan); livestock guarding animals; and pets that are near residences or farm buildings or that are confined by cages,

**Exhibit E-1**

fencing, or leashes, and not including pets running at large or in hunting or training situations;

7(c)  Takings are preceded by a determination by individuals named on this subpermit that the depredation was likely to have been caused by a gray wolf;

7(d)  Depredation at the site is likely to continue in the immediate future if the depredating wolf or wolves are not removed;

7(e)  The taking is performed in a humane manner;

7(f)  The taking occurs within ½ mile of the depredation site;

7(g)  Pups of the year captured before August 1 are released near the capture site; and

7(h)  Depredation control activities within reservation boundaries are coordinated with tribal natural resource personnel, and opportunities provided for tribal involvement in the verification investigation.  In cases when trapped wolves are believed to be primarily residents of a reservation, and if requested by tribal authorities, consideration shall be given to non-lethal control measures upon the first depredation incident.

7(i)  If a verified depredation has not occurred in the current calendar year, lethal control shall only proceed in accordance to Conditions 7(b) through 7(h) and with the following:

7(i)(1)  Verified depredation occurred at the site or in the immediate vicinity during the previous year;

7(i)(2)  There is strong evidence one or more members of the depredating pack has remained in the area since the verified depredation;

7(i)(3)  Based on wolf behavior and other factors, the depredation is likely to be repeated; and

7(i)(4)  Trapping is conducted in a location and in a manner to minimize the likelihood a wolf or wolves from a non-depredating pack is captured.

8.  Wolves trapped trapped under provisions of this subpermit that would otherwise result in their release back to the wild may be euthanized when they have moderate to severe signs of mange or other serious contagious diseases that are likely to result in their death or the death of other wolves.  A maximum of 3 cases of such euthanization is authorized by this subpermit.

9.  Wolves that are severely injured or are in very poor condition as a result of activities or situations not related to this subpermit may be euthanized, up to a maximum of 10 wolves.

10.  Accidental injury and/or mortality (incidental take) resulting from trapping activities may not exceed 4 specimens.  In the event this number is met, all trapping activities shall cease.

11.  All wolf injuries and  mortalities as a result of activities conducted under this subpermit shall be reported to the U.S. Fish and Wildlife Service, BHW Federal Building, 1 Federal Drive, Fort Snelling, MN  55111-4056, telephone (612-713-5343) and the Green Bay Field Office, 2661 Scott Tower Road, New Franken, Wisconsin, 54229 (920/866-1717) within 5 calendar days.  Dead or moribund wolves are to be transferred to the U.S.G.S., National Wildlife Health Center in Madison for necropsy of radio collared or federal legal cases, or submit to Wisconsin Department of Natural Resources Wildlife Health Lab in Monana, Wisconsin for non-collared wolves and state legal cases.  Specimens may be retained for further study or educational purposes with the written permission of the Madison Wildlife Health Laboratory; copies of such permission must be submitted with the report required by this subpermit.  Wolves, or wolf parts, so taken may be transferred to Native Americans for religious and/or cultural purposes, public educational use, or scientific research purposes.  A copy of this subpermit, or a letter of authorization from this office, must be retained with all specimens so transferred.  All requests for carcasses must be made in writing.  Specimens not suitable, or not needed, for such use must be destroyed.

A copy of PRT-697830 is attached, and you are required to adhere to the conditions of that permit.  This subpermit and PRT-697830 must be in your possession while conducting any authorized activities.  You are reminded that necessary state and/or local permits and a U.S. Fish and Wildlife Service bird banding permit, if applicable, must also be acquired and observed; this subpermit is invalid without such permits.  This subpermit does not, either directly or by implication, allow or grant right of trespass.

All specimens obtained under this subpermit remain the property of the United States Government and must be clearly identified as such.

## REPORTING REQUIREMENTS

**Exhibit E-2**

Annual and final reporting requirements for activities conducted under the authority of this subpermit, as well as copies of all data obtained from those activities, are due as described below. In addition, copies of all reports and publications resulting from those data must be submitted to this office as they become available. Failure to furnish any reports that are required by this subpermit is cause for subpermit revocation and/or denial of future permit or subpermit applications.

A report of your activities is due 01/31/2006. At a minimum, your report for activities conducted under the authority of this subpermit must contain a discussion of:

(1) The date, location, age, sex, ear tag number, and general description of the physical condition of each wolf captured;

(2) The results of any non-lethal wolf deterrent studies;

(3) Any administration of medications to captured wolves;

(4) The disposition of wolves killed, injured, salvaged, and/or transported to the Madison Wildlife Health Laboratory;

(5) The results of any blood analyses.

(6) The results of efforts to address and resolve depredation issues.

(7) Reports shall be provided to the following:

Peter Fasbender                     Joel Trick
US Fish and Wildlife Service        US Fish and Widlife Service
BHW Federal Building                Green Bay Field Office
1 Federal Drive                     2661 Scott Tower Drive
Fort Snelling, MN  55111            New Franken, Wisconsin  54229-9565

All correspondence related to this subpermit should reference the subpermit number shown above. Any questions you may have regarding this subpermit should be directed to the Region 3 Endangered Species Permits Biologist at (612) 713-5343.

Wendi Weber
Assitant Regional Director
Ecological Services

Attachment

cc: FWS, Ft. Snelling, LE
    FWS/ES Endangered Species Coordinator for  Wisconsin
    DNR/DOC Endangered Species Coordinator for  Wisconsin

**Exhibit E-3**