UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEFENDERS OF WILDLIFE,  et al.,

               Plaintiffs,

    v.

NORTON, et al.,

           Defendants

Civ. No. 05-01573 (ESH)

FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION

## INTRODUCTION

For the purposes of the instant motion for a preliminary injunction, Defendants the United States Fish and Wildlife Service ("FWS" or the "Service"), et al., concede that Plaintiffs Defenders of Wildlife, et al., have demonstrated a likelihood of success on the merits of their claims under Section 10(c) of the Endangered Species Act.  Defendants, however, respectfully request that the Court not enjoin the limited lethal depredation control measures presently being conducted by the Michigan and Wisconsin Departments of Natural Resources ("DNR") because the FWS is in the process of taking steps to ensure that all interested parties are afforded the opportunity to comment on the issuance of permits to the States of Michigan and Wisconsin authorizing lethal depredation control measures; Plaintiffs have failed to demonstrate irreparable harm to the species as a whole; and the balancing of the harms and the public interest factors weigh in favor of allowing the states to proceed with their limited lethal control activities during the pendency of the notice and comment process.

Prior to addressing the merits of Plaintiffs' request for preliminary injunctive relief, it is important to note, that although Plaintiffs allude to their general concern with the use of Endangered Species Act ("ESA") Section 10 permits for depredation control purposes, this issue is not before the Court at this time and it need not be addressed in order to decide Plaintiffs' request for preliminary relief.  Instead, Plaintiffs' claims in this case, and their motion for a preliminary injunction, are limited to an alleged procedural violation of the notice and comment provision of Section 10 of the ESA.  In addition, the Court should be aware of the fact that, in light of the claims raised in the instant suit and in recognition of the high amount of public interest in wolf recovery in general, the FWS has recently requested that the states resubmit

applications for authority to take depredating wolves under Section 10 of the ESA and, counsel for Defendants has been informed by the FWS, that the applications have been received, and that the agency is currently in the process of drafting a notice regarding the receipt of the new applications from the States of Michigan and Wisconsin for submission to the Federal Register pursuant to Section 10(c).

When the Court turns to Plaintiffs' request for emergency relief, it will become clear that the equitable factors militate in favor of allowing the states to proceed with their limited depredation control activities because in the absence of adequate control measures, public support for wolf recovery and management programs will likely erode and individuals may feel compelled to take matters into their own hands in order to limit the damage done by "problem wolves."[1]  This chain of events will harm third parties and the overall recovery of gray wolves in Michigan and Wisconsin.  Moreover, Plaintiffs cannot demonstrate irreparable harm to the species as a whole because the FWS has completed ESA Section 7 consultation on both lethal take authorizations at issue in this case and, in the Biological Opinions issued by FWS, it has concluded that the depredation control activities that Plaintiffs seek to have enjoined will not jeopardize the gray wolf population in either Wisconsin or Michigan.   Accordingly, with this brief, Defendants respectfully request that the Court exercise its discretion, weigh the equitable factors discussed in more detail below, and not enjoin the authorization granted to the Michigan and Wisconsin DNRs to take depredating wolves in very limited circumstances.

---

[1] "Problem wolves" is a term used to refer to wolves that prey on domestic animals such as livestock and pets.

**BACKGROUND**

I.    **STATUTORY BACKGROUND**

Enacted in 1973, the Endangered Species Act, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tennessee Valley Authority v. Hill, 437 U.S. 153, 180 (1978). Among the congressionally identified purposes of the Act are: (1) "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and (2) "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The terms "conserve," "conserving," and "conservation" are defined as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3); 50 C.F.R. §424.02(c). Such methods and procedures may include, but are not limited to, scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, transplantation, and, in the appropriate circumstances, regulated taking. Id.

Section 10(a)(1)(A) of the ESA authorizes the FWS to issue permits allowing the taking of endangered species "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A); see also National Ass'n of Home Builders v. Norton, 298 F. Supp. 2d 68, 72 (D.D.C. 2003). "When it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretary. See 16 U.S.C. §§ 1533, 1540(f). . . . Fashioning appropriate standards for issuing permits under Section 10 for takings that would otherwise violate § 9 necessarily requires the exercise of broad discretion. . . . When Congress

has entrusted the Secretary with broad discretion, [courts] are especially reluctant to substitute

[their] views of wise policy for his." Babbitt v. Sweet Home Chapter of Communities for a

Great Oregon, 515 U.S. 687, 708 (1995). In relevant part, Section 10(c) provides that "[t]he

Secretary shall publish notice in the Federal Register of each application for an exemption or

permit which is made under this section." 16 U.S.C. § 1539(c).

## II.    FACTUAL BACKGROUND

The Fish & Wildlife Service listed subspecies *Canis lupus lycaon* and *Canis lupus*

*irremotus* as endangered species on the first list of species protected under the ESA, 39 Fed.

Reg. 1158 (Jan. 4, 1974), and added *Canis lupus baileyi* and *Canis lupus monstrabilis* to the list

of endangered species in 1976. 41 Fed. Reg. 17740 (April 28, 1976); 41 Fed. Reg. 24064 (June

14, 1976). In March 1978, the FWS published a rule re-listing the gray wolf at the species level

(*Canis lupus*) to eliminate problems inherent in the prior practice of listing the gray wolf by

subspecies. 43 Fed. Reg. 9607 (March 9, 1978). Under the 1978 rulemaking, the gray wolf was

listed as threatened in Minnesota and endangered throughout the remaining 47 conterminous

United States and Mexico. Id.

### A.    Recovery Progress Under the Recovery Plan for the Eastern United States

The FWS has developed three recovery plans for the gray wolf -- a recovery plan for the

gray wolf in the eastern United States, a recovery plan for the gray wolf in the Northern Rocky

Mountain states, and a recovery plan for the gray wolf in the southwestern United States and

Mexico. The recovery plan for the gray wolf in the eastern United States -- the population to

which the wolves subject to the subpermits at issue in this case belong -- covers a geographical

region extending from Minnesota to Maine and into northeastern Florida and focuses on

recovering the gray wolf population that survived in, and has expanded outward from, northeastern Minnesota. Recovery Plan for the Eastern Timber Wolf ("Recovery Plan"), available at http://www.fws.gov/midwest/wolf/recovery/recov-plan.pdf. The eastern gray wolf population had exceeded the numerical criteria for both downlisting and delisting set forth in the recovery plan. 68 Fed. Reg. 15812. With respect to the Wisconsin gray wolf population, the wolf population was at 373 animals in 2004 and it is estimated that the current population is approximately 400 animals. See Exhibit 1, February 11, 2005 Letter from Wisconsin DNR ("Wisconsin Letter") at 1; Exhibit 2, Biological Opinion for Wisconsin Action ("Wisconsin BiOp") at 8. The average annual rate of growth for the Wisconsin wolf population has been greater than 20% over the past 10 years. Wisconsin BiOp at 8. With respect to the Michigan gray wolf population, it is estimated that the wolf population at the end of winter 2005 was 406 animals. See Exhibit 3, Biological Opinion for Michigan Action ("Michigan BiOp") at 10. Based on these numbers, both the Wisconsin and Michigan wolf populations have greatly exceeded the recovery goals set forth in the Eastern Timber Wolf Recovery Plan. See Wisconsin BiOp at 9; Michigan BiOp at 10; Defenders of Wildlife v. Norton, 354 F. Supp. 2d 1156, 1170-71 (finding that "[t]he Western Great Lakes and Northern Rockies populations achieved the recovery goals . . .").[7]

---

[7] The recovery plan describes two delisting criteria. These criteria are identified as "[a]t least two viable populations within the 48 United States satisfying the following conditions: (1) the Minnesota population must be stable or growing, and its continued survival must be assured and, (2) a second population outside of Minnesota and Isle Royal must be re-established, having at least 100 wolves in late winter if located within 100 miles of the Minnesota wolf population, or having at least 200 wolves if located beyond that distance." Recovery Plan at 4.

**B.     Controlling Depredating Gray Wolves**

The FWS has long recognized that the ability to control depredating gray wolves is a key component to its efforts to recovery the gray wolf populations.    In the absence of adequate control measures, public support for wolf recovery and wolf reintroduction programs will likely erode and individuals may feel compelled to take matters into their own hands in order to limit the damage done by problem wolves.  See infra at § IV.  In order to avoid this situation and thereby enhance the propagation and survival of the species, the FWS has utilized its authority under Section 10 of the ESA to accomplish the necessary task of controlling, and if necessary taking, depredating wolves.  For example, in 1999, the Service noted that in the Northern Rockies it "conduct[s] control of problem wolves through our section 10 permit authority ... [which had] been carried out for 11 years to control problem wolves."  See Availability of the Reassessment of the Interim Wolf Control Plan for the Northern Rocky Mountains, 64 Fed. Reg. 60453 (November 5, 1999); see also Exhibit 10 at ¶ 12 (noting that Wisconsin was issued Section 10 subpermits for depredation control in 1999 and 2003).

Recently, in conjunction with its attempt to reclassify certain population segments of the gray wolf, the FWS issued 4(d) rules which allowed depredating wolves to be taken in limited circumstances.  See Final Rule to Reclassify and Remove the Gray Wolf from the List of Endangered and Threatened Wildlife in Portions of the Conterminous United States ("Final Rule"),  68 Fed. Reg. 15,804, 15,863 (April 1, 2003).  The 4(d) rules were beneficial to the long-term survival and recovery of the species because they encourage human tolerance by providing a legal mechanism for addressing wolf-human conflicts.  68 Fed. Reg. at 15864, 15867, 15868.  Unfortunately, these regulations were recently enjoined and the rule reclassifying certain

population segments of the gray wolf was remanded back to the agency.  See <u>Defenders of</u>

<u>Wildlife v. Norton</u>, 354 F. Supp. 2d at1159-60; <u>National Wildlife Federation v. Norton</u>, 2005

WL 2000712 (D.Vt. 2005).

     In response to the vacature of the rule reclassifying the gray wolves and injunction

prohibiting the continued use of the 4(d) rules, the FWS began operating under the legal regime

that was in place prior to the issuance of the 4(d) rules.  That is, FWS began to once again use its

authority to issue permits under section 10 allowing wolves to be taken in very limited

circumstances.  In addition, FWS informed the relevant states, including the states of Wisconsin

and Michigan, that they could no longer utilize the authority granted to them by the 4(d) rules to

control depredating wolves.  As a result of this inability to continue controlling problem wolves,

on February 11, 2005, Wisconsin DNR requested authority to use lethal and non-lethal methods

to control depredating wolves within the state.  <u>See</u> Exhibit 1,  Wisconsin Letter.  Similarly, on

February 24, 2005, Michigan DNR requested authority to control depredating wolves, which

included the use of lethal and non-lethal methods.  <u>See</u> Exhibit 4, February 22, 2005 Letter from

Michigan DNR ("Michigan Letter").

     On April 1, 2005, the FWS issued a subpermit to Wisconsin DNR.[3]  <u>See</u> Exhibit 5,

Wisconsin DNR Subpermit.  The subpermit was granted under the authority of the Section

10(a)(1)(A) permit granted to Region 3 of the FWS.[4]  <u>Id</u>.  The subpermit allowed Wisconsin

---

[3] The Service first issued a subpermit to Wisconsin DNR on February 28, 2005, but that
subpermit was superceded by the April 1, 2005 subpermit currently at issue.

[4] FWS Region 3, like other FWS Regions, holds a Section 10 permit authorizing the take of
listed species found within the region for scientific purposes or to enhance the propagation or
survival of the species.  <u>See</u>  Exhibit 11, Region 3 Section 10 Permit No. 697830.

DNR to live-trap wolves for monitoring, research, and depredation abatement purposes.  Id.

Among other actions, the subpermit authorizes Wisconsin DNR to trap wolves, collect blood

samples, radio-collar or ear tag a limited number of wolves, aerially track radio-tagged wolves,

to euthanize wolves that are infected with serious contagious disease, and to euthanize wolves

that are captured at sites with a recent documented wolf depredation and a determination has

been made that depredation at the site is likely to continue in the immediate future if the

depredating wolf is not removed.  Id. at 1-2; Wisconsin BiOp at 3.  To minimize the adverse

effects to wolves that are captured, specific limitations have been placed upon Wisconsin DNR

such as (1) a maximum of 34 wolves may be taken at depredation sites, (2) pups of the year

captured prior to August 1 must be released unharmed, and (3) Wisconsin DNR must report any

lethal take to the Service within 5 days.[5]  Wisconsin Subpermit at 1-2; Wisconsin BiOp at 4.

On April 19, 2005, the FWS issued the subpermit to Michigan DNR that is at issue in this

case.  Like the subpermit issued to Wisconsin DNR, the subpermit was granted under the

authority of the Section 10(a)(1)(A) permit issued to Region 3 of the FWS.  See Exhibit 6,

Michigan Subpermit.  The Michigan subpermit is more limited than the Wisconsin subpermit in

several respects.  First, the subpermit issued to Michigan DNR is focused on depredation control

and does not address scientific research.  Michigan Subpermit at 1-2; Michigan BiOp at 5-6.

Specifically, the subpermit authorizes lethal wolf control measures when wolves have been

involved in the depredation of domestic animals and there is strong evidence that the depredation

---

[5] As of September 8, 2005, FWS estimates that 26-29 wolves have been taken pursuant to
Wisconsin's subpermit.  See Exhibit 12, September 8, 2005 Email from Ronald Refsnider.  The
exact number is not known because some of the animals taken may be wolf-dog hybrids.  Id.
The potential hybrid animals have been sent for genetic analysis in order to determine whether
they are in fact wolf-dog hybrids or gray wolves.  Id.

is likely to be repeated. Michigan Subpermit at 1-2; Michigan BiOp at 5-6. Second, pursuant to

the subpermit, Michigan DNR may take a maximum of 20 wolves for depredation control.[9]

Michigan Subpermit at 1. Like the subpermit issued to Wisconsin DNR, Michigan DNR is

required to report lethal takes to FWS within 5 days. Michigan Subpermit at 2. In addition, all

personnel working under the subpermit must receive annual training to minimize accidental

injury and death to wolves. Michigan Subpermit at 2.

Prior to the issuance of the subpermits, FWS entered into formal consultation regarding

the States of Wisconsin and Michigan proposed actions pursuant to Section 7 of the ESA. See

generally Wisconsin BiOp; Michigan BiOp. The consultation process concluded with the

issuance of a Biological Opinion (BiOp) for the subpermit issued to Wisconsin DNR and a BiOp

for the subpermit issued to Michigan DNR wherein the Service concluded that the control and

research actions authorized by the subpermits were not likely to jeopardize the continued

existence of the gray wolf. Michigan BiOp at 23; Wisconsin BiOp at 15.

## III.    LEGAL STANDARDS

### A.    <u>Grant of a Preliminary Injunction</u>

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not

be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v.

Armstrong, 520 U.S. 968, 972 (1997). Plaintiffs have the burden of proving the need for

injunctive relief; defendants bear no burden to defeat the motion. Granny Goose Foods, Inc. v.

Teamsters, 415 U.S. 423, 442-43 (1974); see also Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir.

---

[9] As of September 8, 2005, FWS estimates that Michigan has taken two depredating wolves
under the subpermit. See Exhibit 12.

2004) ("A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion.").  Finally, "because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly."  Fund for Animals v. Norton, 374 F. Supp. 2d 91, 98 (D.D.C. 2005).

In this Circuit, four factors must be considered in determining whether to grant a preliminary injunction: (1) the likelihood of a plaintiff's success on the merits; (2) the possibility that the plaintiff will suffer irreparable injury if relief is denied; (3) the extent to which the balance of hardships favor the respective parties; and (4) whether the public interest will be advanced by preliminary relief.  See Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18, 332 U.S. App. D.C. 407 (D.C. Cir. 1998) (citing Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 182 U.S. App. D.C. 220, 559 F.2d 841, 843 (D.C. Cir. 1977))  Nat'l Ass'n of Farmworkers Orgs. v. Marshall, 628 F.2d 604, 613 (D.C. Cir. 1980); Fund for Animals v. Norton, 374 F. Supp. 2d at 98.

Finally, the timing of a plaintiff's request for injunctive relief is also a factor in weighing the merits of the request.  A plaintiff's delay in seeking injunctive relief can undermine its claim of irreparable injury. "'As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury.'"  Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Social and Rehabilitation Services, 31 F.3d 1536, 1543-44 (10th Cir. 1994) (citation omitted). See also GTE Corp. v. Williams, 731 F.2d 676, 679 (10th  Cir. 1984) (same); Majorica, S.A. v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir. 1985) (lack of diligence, standing alone, may preclude the granting of preliminary injunctive relief); Lydo Enters., Inc. v. City of Las Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984) (preliminary injunction should not issue where plaintiffs had delayed seeking

injunctive relief); <u>Nat'l Council of Arab Americans v. City of New York</u>, 331 F. Supp. 2d 258, 265 (D.N.Y. 2004) (holding that plaintiffs delay of more than one and a half months after the Parks Department's final ruling was one of the equities weighing strongly against a preliminary injunction).

    **B.**    **<u>In this Circuit, Even in an ESA Case, the Court Must Consider All Four Prongs of the Test for Preliminary Injunctive Relief.</u>**

District courts in this Circuit retain some equitable discretion, even in ESA cases. In <u>Tennessee Valley Authority v. Hill</u>, the Supreme Court altered the district courts' exercise of traditional equitable discretion in reviewing ESA Section 7 claims. 437 U.S. 153, 173 (1978). Although <u>TVA v. Hill</u> underscores the weight Congress has placed on the protection of endangered and threatened species, subsequent decisions within the D.C. Circuit recognize that all four prongs of the court's traditional analysis remain applicable when construing Section 7 of the ESA in the context of a motion for a preliminary injunction. Therefore, this Court retains equitable discretion in the instant case.

In an ESA Section 7 case decided virtually on the heels of <u>TVA v. Hill</u>, plaintiffs sought to prevent the sale of oil and gas leases in the Beaufort Sea and made a substantial showing that the lease sale would jeopardize the existence of an endangered species in violation of the Endangered Species Act and that the Department of the Interior had failed to comply with the requirements of the National Environmental Policy Act. <u>North Slope Borough v. Andrus</u>, 486 F. Supp. 325, 329 (D. D.C. 1979). The court specified that a court should consider

> (1) whether Plaintiffs have demonstrated a substantial likelihood that they will ultimately prevail on the merits; (2) whether Plaintiffs will suffer irreparable harm absent injunctive relief; (3) whether injunctive relief will harm other interested parties; and (4) whether the public interest favors issuance of injunctive relief pending a determination of the merits.

Id. at 329.

      Even if a plaintiff succeeds in showing a substantial likelihood of success on the merits, an injunction does not automatically ensue.  A plaintiff must also demonstrate that, "absent such relief they face serious irreparable harm prior to a final determination of the merits."  Id. at 330. Furthermore, the court recognized that "[i]n weighing the issuance of preliminary injunctive relief, the Court must consider as well the interest of third parties."  Id. at 331.  The court was persuaded that the "economic interests of the State of Alaska cut against the issuance of preliminary relief."  In denying injunctive relief, the court proceeded with balancing the propriety of injunctive relief, and concluded that

> final relief, if appropriate, will be sufficient to vindicate the public interests that Congress has sought to further through the ESA and NEPA.  If, however, Plaintiffs do not prevail on the merits, the issuance of preliminary relief would have hindered the admittedly conflicting public interest in development of outer continental shelf resources set forth in the Outer Continental Shelf Lands Act.

Id. at 332.

## ARGUMENT

## I.    DEFENDANTS CONCEDE THAT PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.

      For the purposes of Plaintiffs' motion for a preliminary injunction, Defendants concede that they received an application from Michigan DNR for a Section 10 permit and that notice of that application was not published in the Federal Register pursuant to Section 10(c) of the ESA. See Exhibit 4, Michigan Letter.   As a result, Defendants do not contest that Plaintiffs have demonstrated a likelihood of success on the merits of their legal arguments concerning the notice and comment provision of Section 10 with respect to Michigan DNR's application.  In addition, for the purposes of Plaintiffs' motion for a preliminary injunction, Defendants do not contest that

Plaintiffs have a likelihood of success on the merits of their procedural claim regarding

Wisconsin DNR's request for authority to utilize lethal control measures on gray wolves within

the state.   In order to address Plaintiffs' concerns regarding Section 10(c)'s procedural

requirements and in recognition of the high public interest in wolf recovery in general, the FWS

has recently requested that the states resubmit applications for authority to take depredating

wolves and, counsel for Defendants has been informed by the FWS, that the applications have

been received, and the agency in the process of drafting a notice regarding the receipt of the new

applications from the States of Michigan and Wisconsin for submission to the Federal Register

pursuant to Section 10(c).

## II.    PLAINTIFFS HAVE FAILED TO DEMONSTRATE IRREPARABLE HARM.

Even conceding that Plaintiffs have demonstrated a likelihood of success on the merits,

they nevertheless bear the burden of demonstrating that their interests will suffer irreparable

harm unless this preliminary injunction is granted.   This is a burden that Plaintiffs cannot carry

in this case.  Despite Plaintiffs' suggestions to the contrary, irreparable harm is not presumed

simply because this case involves an endangered species.  The appropriate standard for

irreparable harm is not the "take" of individual animals, even if those animals are endangered or

threatened, but rather "jeopardy" to the entire species.[7]  See Water Keeper Alliance v. United

States Dep't of Defense, 271 F.3d 21, 34 (1st Cir. 2001); Fund for Animals, Inc. v. Turner, Civ.

A. No. 91-2201-MB, 1991 WL 206232, *8 (D.D.C. 1991).

In support of their claim of irreparable harm, Plaintiffs cite Fund For Animals v. Turner,

---

[7] To "jeopardize the continued existence" of a species means to "reduce appreciably the
likelihood of both the survival and recovery of a listed species in the wild."  50 CFR § 402.02.

C.A. No. 91-2201 (MB),1991 WL 206232 (D.D.C. 1991).  In that case, the court granted a
preliminary injunction setting aside a regulation that authorized the sport hunting of a limited
number of grizzly bears (which are listed under the ESA as a threatened species).  Id. at *8-9.
The court concluded that plaintiffs had shown a likelihood of success on the merits because
"Congress has specifically limited the hunting of a threatened or endangered species to
extraordinary cases of population pressures . . . ."  Id. at *7.

Based on the facts present in that case, the court also found that plaintiffs had
demonstrated irreparable harm.  The court expressly held, however, that the law -- including the
Supreme Court's decision in TVA v. Hill -- did not compel the issuance of an injunction because
there was "not the remotest possibility that the limited hunting of the grizzly bear during the
period in which a preliminary injunction would be in place will eradicate the species."  Id. at *8.
And the court rejected plaintiffs' argument that "once the Court finds a likelihood that agency
action is in violation of the ESA, irreparable injury is presumed . . . ."  Id. at *8.  As such, the
court's holding in Fund for Animals is consistent with other cases that have held that plaintiffs
must demonstrate irreparable harm by showing impacts to species and not simply to individual
animals, even if they are endangered.

Thus, in order to demonstrate irreparable harm to the species for the purposes of their
request for a preliminary injunction, Plaintiffs need to demonstrate, not that individual wolves
will be impacted, but that the actions at issue will jeopardize the species as a whole.  Plaintiffs
cannot make this showing.  The unchallenged Biological Opinions issued by the FWS
demonstrate that the subpermits will not jeopardize the gray wolf populations in Michigan and
Wisconsin.  Plaintiffs, therefore, have failed to demonstrate irreparable harm that would warrant

-15-

the issuance of a preliminary injunction.

After reviewing the current status of the gray wolf, the environmental baseline for the action area, the effects of the actions and the cumulative effects, the Service issued two Biological Opinions -- one for each subpermit – which correctly concluded the lethal control measures authorized by the subpermits are not likely to jeopardize the continued existence of the gray wolf in Wisconsin and Michigan.  Exhibit 3, Michigan BiOp at 23, Exhibit 2, Wisconsin BiOp at 15.   This constitutes the opinion of the FWS -- the expert agency charged with implementing the ESA.  Importantly, Plaintiffs do not challenge the Service's conclusions as set forth in the Biological Opinions.  As a result, Plaintiffs cannot claim that the actions authorized by the subpermits will jeopardize the continued existence of the gray wolf populations in Michigan and Wisconsin.

The conclusions set forth in the Biological Opinions are based on the Service's many years of experience in successfully managing gray wolves and empirical data from the two years of lethal depredation control in Wisconsin, as well as over 25 years of data from very similar lethal control activities in Minnesota.  Exhibit 7, Refsnider April 14, 2005 Memorandum to the Region 3 Endangered Species Program Manager ("April Memo") at 4; Exhibit 8, Refsnider March 17, 2005 to the Region 3 Endangered Species Program Manager ("March Memo") at 3-4. The empirical data available demonstrates that (1) the wolf populations in Wisconsin and Michigan have surpassed recovery goals; (2) the wolf populations continued to thrive after the initiation of depredation control measures; and (3) the mortality authorized by the subpermits is not likely to slow the recovery of the species because wolf takes will likely be partially compensatory (fewer wolves will die from starvation, interspecies strife, or other natural causes)

-16-

and the ability of the states to take problem wolves will likely decrease the illegal take of wolves.

Exhibit 3, Michigan BiOp at 23-24.   Hence, based on the best available scientific information,

the FWS properly concluded that the activities authorized by the subpermits are not likely to

jeopardize the gray wolf populations in Wisconsin and Michigan.[9]

## III.    THE ISSUANCE OF AN INJUNCTION WILL HARM OTHER INTERESTED PARTIES.

The issuance of an injunction will harm Wisconsin and Michigan by eliminating their

ability to effectively manage depredating wolves.  These states have cooperated with all

interested parties in the ongoing, and highly successful, effort to restore gray wolves to the

---

[9] In addition, Plaintiffs' claim of irreparable injury is undermined by their delay in seeking emergency relief. Courts have noted that, "[a]s a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury." Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Social and Rehabilitation Services, 31 F.3d 1536, 1543-44 (10th Cir. 1994) (citation omitted).   In this district, Judge Roberts observed that "[t]hough [plaintiffs' eight-month] delay [in seeking emergency relief] is not dispositive of the issue, it further militates against a finding of irreparable harm." Mylan Pharmaceuticals, Inc. v. Shalala, 81 F. Supp.3d 30, 44 (D.D.C. 2000).  Here, Plaintiffs seek emergency preliminary relief more than 4 months after having been made aware of the issuance of the subpermits. On April 15-16, 2005,  a public meeting involving numerous interested stakeholders in wolf recovery was hosted by Wisconsin DNR.  See Exhibit 9, Refsnider Declaration ("Decl.") at ¶ 9-12. Ronald L. Refsnider attended the meeting as a representative of the FWS.  Id.  Also in attendance were representatives of the Humane Society of the United States and Defenders of Wildlife -- Plaintiffs in the instant lawsuit. Id. at ¶¶ 11-12.  During the meeting, Mr. Refsnider announced to those in attendance that the FWS had issued a subpermit for limited lethal depredation control to Wisconsin DNR and that the FWS had received an application for a similar subpermit from Michigan DNR. Id. On April 26 - 27, Mr. Refsnider attended the Midwest Wolf Stewards Annual Meeting in Hinckley, Minnesota, a meeting attended by Defenders of Wildlife and Humane Society Representatives, where he made a similar announcement concerning the Michigan and Wisconsin subpermits. Id. at ¶¶13-14.  Finally, it should be noted that in April of 2005, the subpermits and supporting documents were posted on the Region 3 website where they could be accessed by any interested party. Id. at ¶ 8.  Defendants point these facts out, not to argue that they are the practical equivalent of the Section 10(c) notice and comment requirement, but instead to show that Plaintiffs waited approximately 4 months to seek emergency relief, a fact that militates against a finding of irreparable harm.

Midwest.  After the Oregon Court enjoined the 4(d) Rules, the States of Wisconsin and Michigan properly sought the authority to control depredating wolves under Section 10 of the ESA.  An injunction here would harm the States of Wisconsin and Michigan and their citizens by removing this important management tool and vital component in the overall gray wolf recovery strategy.

In requesting authority to control depredating wolves, Wisconsin DNR made clear that the requisite authorization was needed immediately for several reasons.  First, because the wolf population had grown so rapidly, wolves were beginning to expand into agricultural areas containing livestock.   Second, as a result of the fact that wolves occupy nearly all areas of suitable habitat (i.e., areas uninhabited or sparsely populated by humans and livestock), suitable areas for translocating problem wolves were no longer available.  Exhibit 1, Wisconsin Letter at 1-2.  Finally, Wisconsin was concerned that in the absence of proper control measures, public support for the wolf recovery program would begin to wane and members of the public would take matters into their own hands.  Indeed, Wisconsin DNR specifically stated that "[l]ocal people and county officials are becoming resentful against release of problem wolves into their area . . . [and] . . . [t]ranslocation of wolves into saturated habitat puts wolves into greater jeopardy and risks spreading the problem and creating more resentment against wolf recovery."  Id.

Michigan DNR expressed similar concerns in requesting authority to control depredating wolves.   Like Wisconsin DNR, the agency noted that public support for the wolf recovery program in Michigan was eroding due to the exponential increase in wolf-related livestock depredation and attacks on pet dogs.  Exhibit 4, Michigan Letter at 1.  In particular Michigan noted a recent increase in illegal wolf killings as a result of "mounting anti-wolf sentiment . . . ."

Michigan Letter at 1.  In requesting authorization to take depredating wolves, Michigan DNR
made clear that without a subpermit "the options currently available to [the state] are impractical
or insufficient for effective management of the wolf population."  Id. at 2.

An order enjoining the subpermits would put Michigan and Wisconsin DNR in an
unworkable position.  The agencies will be unable to effectively manage the wolf populations
within their states and the citizens of those states, whose livestock and pets are threatened by
depredating wolves, will undoubtedly be harmed.

## IV.    AN INJUNCTION WILL NOT SERVE THE PUBLIC INTEREST

Finally, granting Plaintiffs' request for a preliminary injunction will not serve the public
interests because the subpermits promote the conservation of the species and enjoining their use
will likely harm the gray wolf populations in Michigan and Wisconsin.

It is undisputable that human persecution of gray wolves is the primary factor that
brought the gray wolf to the brink of extinction.  Exhibit 10, Refsnider Second Decl. at ¶ 6.  As
a result, developing a more positive human attitude toward wolves is without a doubt a key
component in federal and state wolf recovery and management plans.  Id.  This effort typically
involves a two-pronged approach.  Id.  First, efforts are made to educate the public concerning
the wolves' proper place in the ecosystem.  Id.  Second, efforts are made to reduce conflicts
between wolves and domestic animals (i.e., livestock and pets).  Id.  Indeed, because of the
recognized benefits of controlling problem wolves, depredation control activities have been part
of the Federal and State recovery plans for gray wolves.  See Recovery Plan at 20 (noting that
ecologically sound management includes "depredation control where wolves are killing domestic
animals").  The bottom line is that, rather than harming the wolf population as a whole,

depredation control measures actually benefit the species and must be part of a comprehensive management strategy.

Plaintiffs' contention that "there is [] no reason to think that any loss of public support resulting from a preliminary injunction would cause greater harm to wolves . . ." is simply inaccurate.   Plaintiffs' Memorandum ("Pls' Memo.") at 17.   The phrase "shoot shovel and shut up" is often heard at meetings and public hearings regarding the status of the gray wolf.   Exhibit 10, Refsnider Second Decl. at ¶ 7.   Unfortunately, this crude expression represents a common sentiment among certain segments of the public: if the government does not remove problem wolves, segments of the public will attempt to accomplish the task illegally.   Id.; Exhibit 7, April Memo at 6.   These types of private killings must be avoided at all costs because they are illegal and will be conducted in the absence of supervision or guidance from trained professionals in the field of wildlife management.   As a result, these illegal takes are likely to result in the wrong wolves being killed in an undocumented setting and in numbers that are too high.   Exhibit 7, April Memo at 6.   By contrast, the coordinated and limited depredation control programs permitted under the subpermits, efficiently and precisely remove problem wolves, while minimizing the negative impacts to the wolf populations in the states.   Id.[9]   The depredation control authorized by the subpermits at issue in this case restrict lethal control measures to situations where it is highly unlikely that non-depredating wolves or wolf packs will be killed. Exhibit 10, Refsnider Second Decl. at ¶ 8.   Additionally, the subpermits place strict limits on the

_____

[9] Plaintiffs will likely argue that the threat of unauthorized and illegal killings is speculative. This is simply not true.   The threat of illegal wolf take is very real and is predicted by one of the Service's experts on the topic of gray wolf management.   See Exhibit 10, Refsnider Second Decl. ¶ 5 (noting his 16 year involvement with wolf recovery and the people impacted by wolf recovery).

-20-

number of wolves that may be killed for the purpose of depredation control.  Exhibit 5, Wisconsin Subpermit; Exhibit 6, Michigan Subpermit.

In support of their request for a preliminary injunction, Plaintiffs' contend that "[t]aking wolves in these state [sic] pursuant to the Wisconsin Permit and Michigan Permit . . . 'disturb and stress intra-pack relationships, and cause a decline in the area wolf population.'"  Pls' Mem. at 16 (quoting Herschelman declaration).[10]  This contention is not supported by the available scientific data.  To the contrary, as discussed above, "[l]imited lethal depredation control actions of [the type authorized by the subpermits], while perhaps disturbing to some people, are supported by years of empirical data that demonstrate their proper place in a comprehensive recovery and management program for gray wolves in the Midwest."  Exhibit 8,  March Memo at 6; see also Exhibit 7, April Memo at 6 (concluding that "euthanizing depredating wolves under the conditions [set forth in the Michigan DNR subpermit] will promote the conservation of the species in Michigan"); Exhibit 10, Refsnider Second Decl. at ¶¶ 14-15.  For these reasons, the public interest in the long-term health and recovery of the gray wolf populations in Michigan and Wisconsin will be best served by permitting the states to continue their depredation control activities.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be denied.

---

[10] It is unclear whether Mr. Herschelman is qualified to offer a scientific opinion concerning the biological effects of wolf management techniques.

Dated:  September 8, 2005                Respectfully Submitted,

                                                        KELLY JOHNSON, Acting Asst. Attorney General
                                                        JEAN E. WILLIAMS, Section Chief


                                                        _____/s/_____
                                                        JIMMY A. RODRIGUEZ, Trial Attorney
                                                        U.S. Department of Justice
                                                        Environment & Natural Resources Division
                                                        Wildlife & Marine Resources Section
                                                        Ben Franklin Station, P.O. Box 7369
                                                        Washington, DC 20044-7369
                                                        Phone: (202) 305-0342/ Fax: (202) 305-0275
                                                        Email: Jimmy.Rodriguez@usdoj.gov

                                                        Attorneys for Federal Defendants

Of Counsel:
Tony Sullins
Office of Solicitor
United States Department of the Interior