UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DEFENDERS OF WILDLIFE, et al., | ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) Civ. No. 05-01573 (ESH) |
| NORTON, et al., | ) ) ) |
| Defendants | ) ) ) |

I, Ronald L. Refsnider, declare as follows:

1. I am the U.S. Fish and Wildlife Service's ("Service") Endangered Species Listing Coordinator for Region 3, which has its Regional Office in Minneapolis, Minnesota. In this capacity I am responsible for the overall coordination of all Region 3 activities associated with the listing portion of the Service's mandate under the Endangered Species Act of 1973, as amended ("ESA"). These activities include investigating species for addition to the Service's list of candidate species; processing petitions to add, reclassify, or remove species from the list of endangered and threatened species ("list") or to revise critical habitat; proposing species for addition to the list, for reclassification from threatened to endangered or vice versa, or for removal from the list ("delisting"); finalizing such actions; proposing and finalizing designations or revisions to critical habitat for listed species; and activities related to such actions, including budgeting and outreach activities for listing-related work.

2. In 1989 I became the Service's liaison to the Eastern Timber Wolf Recovery Team (Recovery Team) as it was revising and updating the 1978 Recovery Plan (1978 Plan) for the Eastern Timber Wolf. In this capacity I assisted the Recovery Team in addressing the comments received from wolf experts, government agencies, environmental and animal welfare organizations, and members of the public during the initial and extended public comment period for the draft revised Recovery Plan. I also assisted the Recovery Team in revising the draft Recovery Plan to incorporate changes brought about by these comments, resulting in a final revised Recovery Plan in 1992 (1992 Plan). As a result of these responsibilities I became very familiar with the threats to the gray wolf in the Midwest, and the actions the Recovery Team believed are necessary for the recovery of the gray wolf in the Eastern United States.

3. Since late 1997 and up until April 1, 2003, I was the national coordinator for the Service's gray wolf reclassification and delisting efforts. In this role I became the coordinator and primary author of the Service's Proposal to Reclassify and Remove the Gray Wolf From the List of Endangered and Threatened Wildlife in Portions of the Conterminous United States, published in the *Federal Register* on July 13, 2000, and of the Service's subsequent Final Rule to Reclassify and Remove the Gray Wolf From the List of Endangered and Threatened Wildlife in Portions of the Conterminous United States, published in the *Federal Register* on April 1, 2003.

4. Since April 1, 2003, and continuing to this date, I have been the Service's lead biologist in assisting the Department of Justice in litigation on the April 1, 2003, reclassification; I have assisted in the preparation of the Service's July 21, 2004, delisting proposal for the EDPS; and I continue to be deeply involved in wolf recovery activities in the Midwest.

2

5. The purpose of this declaration is provide my opinion, based on 16 years of involvement with wolf recovery and the people impacted by wolf recovery, regarding the balancing of harm to wolf recovery with the harm to individual wolves.

6. Human persecution of gray wolves is without doubt the primary factor that led to the species' extirpation across most of its historical range and to the near-extinction of the species from the 48 states. Developing and maintaining more positive, or at least less negative, human attitudes toward wolves is a key component in all Federal and state wolf recovery and management plans that sincerely aim for recovery of the species. The 1992 Plan, which I assisted in finalizing, has two thrusts that deal with public attitudes. One is an education component, aimed at informing the public about the biological and ecological facts regarding wolves. The second is an effort to reduce conflicts between wolves and domestic animals, including livestock and pets. The Service's 1992 Plan (made available as a draft for public review and comment for five months in 1990) contains a discussion of the need for government wolf depredation control for most of Minnesota, where wolves had already achieved the population goal specified in the Recovery Plan. It also identifies a need for developing management practices, including the killing of problem animals, for re-established wolf populations in Wisconsin and Michigan.

7. Over the last 16 years, I have attended many public meetings on the wolf and participated in over a dozen public hearings dealing with reclassifying or delisting the gray wolf. One of the most widespread attitudes that I have heard is the need to control and remove "problem wolves." I have come to believe that most members of the public are willing to accept a large recovered gray wolf population if it does not threaten human safety and if it will not lead to excessive attacks on livestock and pets. The phrase "shoot, shovel, and shut up" is

often heard at wolf meetings and hearings, and it dramatically summarizes the reality that if the government (federal, state, and/or tribal) does not remove problem wolves, a segment of the local populace will try to accomplish that chore illegally, and on their own.

8. The provisions in the Wisconsin and Michigan subpermits restrict lethal control to situations where it is highly likely that the depredating wolves or depredating pack will be the only wolves that are killed. Furthermore, the subpermits place limits on the number of wolves that may be killed for this purpose. In stark contrast, a "shoot, shovel, and shut up" approach will likely produce the dual misfortune of targeting the wrong wolves (any wolves the shooters encounter, rather that the depredating wolves), as well as killing an excessive number of wolves.

9. The Service contends, the Recovery Team states, and the data indicate that in 1999 gray wolves in the Midwest met and exceeded the specified numerical recovery goals for five years. Judge Jones' ruling in Defenders v. Norton also states that wolves in the Western Great Lakes have "achieved the recovery goals."

10. Our April 2005 subpermits to WI and MI were each preceded by two careful assessments of the impacts of limited depredation control. These assessments were separately done by field office personnel and by myself; the field office assessment was a formal biological opinion under the requirements of section 7 of the ESA to determine if such take would jeopardize the continued existence of the species. My assessments were intended to determine the biological impact of such depredation control efforts. All these assessments had the advantage of being based on two years of empirical data from the depredation control actions carried out in these two States under the 2003 section 4(d) special rule. Therefore, our assessments of the results of these subpermits did not speculate or guess on the extent of the

impacts; rather, we knew in advance that there would be no adverse affect on the recovery of wolves in Wisconsin and Michigan. Furthermore, unlike the section 4(d) special rule, we specified the number of wolves that could be killed in each state in order to limit the impact, and we required that all wolf mortalities be reported to the Service within five calendar days, to allow a prompt evaluation of any unexpected impacts.

11. Data from the similar MN wolf depredation control program, also authorized under a section 10(a)(1)(A) subpermit to USDA-APHIS-Wildlife Services, similarly show that several decades of similar lethal depredation control has had no adverse impacts on the recovered wolf population in that state.

12. FWS resisted the initiation of lethal control of depredating wolves in WI and MI until numerical recovery goals were achieved, and we were confident that limited lethal control would not reverse recovery. Region 3 issued the first subpermit for lethal depredation control to WI DNR in May 1999 to kill a single wolf within a large deer farm; the wolf had eluded repeated attempts to trap and translocate it. In March 2003 a second lethal control subpermit was issued to WI DNR to kill a total of 12 wolves that were known to be repeat depredators or that were involved in chronic depredation incidents at two specific farms. A third lethal control subpermit was issued to WI DNR on February 28, 2005, following the Defenders v. Norton ruling, and it reauthorized the killing of up to 8 wolves known to be repeat depredators on livestock.

13. I was involved in the deliberations for all of these subpermits, as well as the two subpermits that are the subject of this litigation. In all cases, I believe that the subpermits have made it clear that the government can and will remove problem wolves, and therefore will result in

5

the killing of fewer wolves than would occur from illegal killing if such control actions were not carried out by the State agencies.

14. I believe that an interruption of the current depredation control efforts by WI and MI DNRs will be viewed by some individuals as an indication that the Federal and State governments are unable to control problem wolves and unable to minimize the impact of wolf recovery on human activities. Some of those individuals will begin "shoot, shovel, and shut up" control of what they perceive to be problem wolves.

15. My conviction, based on the above experience and information, is that the public good, in the form of gray wolf recovery in Wisconsin and Michigan, under the mandate of the Act, is best served by maintaining an efficient and credible wolf depredation control program as authorized in the current subpermits to Wisconsin and Michigan DNRs.

16. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.

Executed in Fort Snelling on this 7th day of September, 2005.

*[signature: Ronald L. Refsnider]*