**UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| Defenders of Wildlife, American Lands Alliance, Animal Protection Institute, Center for Biological Diversity, Friends of Animals and Their Environment ("FATE"), Help Our Wolves Live ("HOWL"), The Humane Society of the United States, Indigenous Environmental Network, Klamath Forest Alliance, Minnesota Wolf Alliance, RESTORE: The North Woods, Sierra Club and the Wildlands Project,<br><br>                      Plaintiffs,<br><br>vs.<br><br>Gale Norton, Secretary of the Interior, United States Department of the Interior, Matthew J. Hogan, Acting Director of the United States Fish and Wildlife Service, and United States Fish and Wildlife Service,<br><br>                      Defendants. | **Civil No. 1:05CV-01573-ESH** |

---

**PLAINTIFFS' REPLY TO DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**ARGUMENT**

Defendants, the Fish and Wildlife Service ("FWS") et al., readily concede that the "take" permits issued to the Michigan Department of Natural Resources and the Wisconsin Department of Natural Resources were issued in violation of the Endangered Species Act ("ESA"). Rather than voluntarily withdrawing those unlawfully issued permits, however, the FWS asks the Court to turn a blind eye to the ESA's procedural mandates and allow the illegal taking of endangered species to continue. In other words, the FWS requests the Court to sanction its cavalier "ask forgiveness, not permission" attitude toward nondiscretionary procedural mandates. Despite the FWS's request that the Court deny injunctive relief in the face of admittedly illegal permits that authorize the taking of endangered species, a preliminary injunction is necessary to prevent irreparable harm and to uphold the public interest.

**I.     DEFENDANTS CONCEDE THAT THE PERMITS ARE UNLAWFULLY ISSUED**

In this case Defendants concede that Plaintiffs are likely to succeed on the merits of their procedural challenge. While that concession does not alone require the court to grant injunctive relief, a plaintiff's ability to demonstrate likelihood of success on the merits is recognized as the most important of the four factors relevant to determining whether to grant a preliminary injunction. See People for the Ethical Treatment of Animals, Inc. v. Gittens, 215 F. Supp. 2d 120 (D.D.C. 2002) (stating that "[t]he first prong of the four-part test for a preliminary injunction . . . [,]the substantial likelihood of success on the merits[,] . . . is the most important for the purposes of the Court's analysis"). See also, CityFed Financial Corp. v. Office of Thrift Supervison, 58 F.3d 738, 746 (D.C. Cir. 1995) (stating that "an injunction may be justified, for

example, where there is a particularly strong likelihood of success on the merits even if there is a relative slight showing of irreparable injury"). [1]

Under the Administrative Procedure Act, a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When an agency fails to comply with required procedure or substantive law, the appropriate remedy is to enjoin the agency from continuing the action that was the product of the unlawful decision-making. Weinberger v. Romero-Barcelo, 456 U.S. 305, 314 (1982) (only an injunction can vindicate the objectives of the ESA); Tennessee Valley Authority v. Hill, 437 U.S. 153, 172-73 (1978) (permanent injunction halting construction of dam until compliance with ESA's Section 7 requirements); Biodiversity Legal Found. v. Badgley, 309 F.3d 1166, 1177-78 (9th Cir. 2002) (granting injunction to compel listing determination under the ESA); Defenders of Wildlife v. Administrator, E.P.A., 882 F.2d 1294, 1301 (8th Cir. 1989) (enjoining EPA and stating that agency can seek removal of the injunction once it has complied fully with the ESA).

The Defendants fail to cite to any cases where a court has denied injunctive relief despite plaintiff's certain success on the merits and despite a showing of irreparable harm to individual members of an endangered species. Indeed, in cases where there is a sufficient demonstration of success on the merits and irreparable harm, the Supreme Court has said that an appellate court

---

[1] Notably, a federal district court recently ruled that the FWS failed to follow proper procedure in another action involving its wolf management decisions. In reviewing the FWS's April 2003 Final Rule that sought to downlist wolves from endangered to threatened status, the United States District Court for the District of Vermont held that the Final Rule deviated substantially from the Proposed Rule and that the FWS therefore violated the Administrative Procedure Act by failing to provide adequate opportunity for notice and comment. See National Wildlife Federation v. Norton, No. 1:03-CV-00340, slip op. at 14-15 (D. Vt. August 19, 2005), attached hereto as Exhibit H to Affidavit of Sanne H. Knudsen. The district court in Vermont is the second federal district court to strike down the FWS's attempt to downlist wolves to threatened status. Cf. Defenders of Wildlife v. Norton, 354 F. Supp. 2d 1156, 1159-60 (D. Or. 2005).

3

might properly hold that a district court has abused its discretion if injunctive relief is denied. See Elrod v. Burns, 427 U.S. 347, 374 (1976). In this case, not only have Defendants conceded Plaintiffs' success on the merits, but also, as discussed below, the killing of endangered species undoubtedly constitutes irreparable harm.

## II.  HARM TO INDIVIDUAL MEMBERS OF AN ENDANGERED SPECIES CONSTITUTES IRREPARABLE HARM

The FWS asserts that no irreparable harm will result from the continuation of activities under unlawfully issued permits. See Federal Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Mem. Op.") at 2, 14. Those contentions are without merit. First, environmental injury, by its very nature, is irreparable. See Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987); Nat'l Wildlife Fed'n v. Burford, 835 F.2d 305, 323 (D.C. Cir. 1987) (grant of preliminary injunction proper as federal government's lifting of protective land restrictions could result in irreparable injury by "permanently destroying wildlife habitat, air and water quality, natural beauty, and other environmental and aesthetic values and interests"). The illegal killing of wolves is irreparable harm that can be remedied only by enjoining the activities authorized by the unlawfully issued permits.

Second, at least one court has recognized that irreparable damage is presumed to flow from procedural violations of the ESA. See Thomas v. Peterson, 753 F.2d 754 (9th Cir. 1985). The court in Thomas enjoined construction of a timber road in a former national forest roadless area where the federal agency failed to prepare a biological assessment as required by the ESA to determine the impact of the road and proposed timber sales on the endangered Rocky Mountain Gray Wolf. Id. at 763-65.

4

Third, contrary to the FWS's assertions, the showing of irreparable harm does not require showing that the entire species will be jeopardized absent the injunction.[2] In fact, this Court has already recognized that the strong congressional mandates in the ESA to protect endangered and threatened species supports the finding that the loss of even a few members of a listed species through agency action constitutes "a significant, and undoubtedly irreparable, harm." Am. Rivers v. U.S. Army Corps of Eng'rs, 271 F. Supp. 2d 230, 259 (D.D.C. 2003); The Fund for Animals v. Turner, C.A. No. 91-2201, 1991 U.S. Dist. LEXIS 13426, *26 (D.D.C. Sept. 27, 1991) (unpublished opinion). Other courts have taken a similar view. See Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1258 (10th Cir. 2003) (holding that "denial of a preliminary injunction [based] on the plaintiff's failure to establish harm to the species as a whole . . . was an abuse of discretion"); Defenders of Wildlife v. Administrator, EPA, 882 F.2d 1294, 1303 (8th Cir. 1989) (affirming the district court's decision to enjoin the continued registration of a pesticide until that registration could be accomplished without illegally taking endangered species, which included the wolf); Bensman v. United States Forest Service, 984 F. Supp. 1242, 1250 (W.D. Mo. 1997) (recognizing that "death is certainly an irreparable harm" and granting a preliminary injunction to halt timber sales that may adversely impact the Indiana bat, an endangered species, because the court determined that the Forest Service violated the ESA).

---

[2] Defendants assert that "[i]mportantly, Plaintiffs do not challenge the Service's conclusion as set forth in the Biological Opinions. As a result, Plaintiffs cannot claim that the actions authorized by the subpermits will jeopardize the continued existence of the gray wolf populations in Michigan and Wisconsin." See Mem. Op. at 16. Plaintiffs have not addressed the merits of the Biological Opinions because the substantive basis for those Opinions is irrelevant to this case. Showing of irreparable harm does not turn on whether the unlawfully issued permits will jeopardize the continued existence of the gray wolf populations in Michigan and Wisconsin. Irreparable harm is evident by the lethal taking of individual wolves pursuant to unlawfully issued permits.

The district court in <u>Defenders of Wildlife v. Norton</u>, a case decided earlier this year that vacated the FWS's April 2003 Rule to downlist wolves, addressed whether the taking of wolves constitutes irreparable harm. After determining that "the death or injury of endangered wolves . . . is irreparable injury," the district court enjoined the implementation of the FWS's Section 4(d) regulations that authorized the lethal taking of wolves for depredation control purposes. <u>Defenders of Wildlife v. Norton</u>, 354 F. Supp. 2d at 1174. The lethal control provisions contained in the permits at issue in this case are nearly identical to the Section 4(d) regulations that were enjoined in <u>Defenders of Wildlife v. Norton</u>. Notably, the court did not make any finding that the enjoined regulations would jeopardize the entire species; rather, the court rooted its determination of irreparable harm on the taking of individual wolves that was authorized by the regulations. Indeed, the court <u>rejected</u> the FWS's argument that "an injunction is not appropriate because the impact on the gray wolf is modest." <u>Defenders of Wildlife</u>, 354 F. Supp. 2d at 1174.

The FWS relies on this Court's decision in <u>Fund for Animals v. Turner</u> to support its contention that irreparable harm requires a showing that takings under the unlawfully issued permits will jeopardize the species as a whole. <u>See</u> Mem. Op at 15. The FWS simply misreads the case – <u>Turner</u> in no way suggests that a showing of irreparable harm requires showing impacts to an entire species. In fact, <u>Turner</u> explicitly states the opposite: "the loss of even of the relatively few grizzly bears that are likely to be taken through a sport hunt . . . is a significant, and undoubtedly irreparable, harm." 1991 U.S. Dist. LEXIS 13426 at *26. After determining that plaintiffs had shown irreparable injury – the killing of a threatened species – and after determining that plaintiffs had shown a likelihood of success on the merits, the court in <u>Turner</u> issued a preliminary injunction. <u>Id.</u> at *28. Notably, <u>Turner</u> concluded that taking individual

6

members of a threatened species constitutes irreparable harm, whereas this case involves endangered species, which are afforded even greater protection under the ESA.

The FWS incorrectly bootstraps Turner's analysis of TVA v. Hill to suggest that irreparable harm requires showing jeopardy to an entire species.  After analyzing the Supreme Court's decision in TVA v. Hill, Turner merely concluded that a district court is not required to issue an injunction unless the absence of a preliminary injunction would jeopardize the existence of a species.  See id. at *24-25.  This conclusion has nothing to do with the showing that is necessary for demonstrating irreparable harm.

Requiring Plaintiffs to show jeopardy to the existence of a species in order to secure injunctive relief would stand the ESA on its head.  Without the ability to enjoin illegal taking under the ESA, courts would be without power to prevent harm to endangered species before a species was on the brink of extinction.  This means that the irreparable harm standard suggested by the FWS would impede the agency's own ability to enforce the ESA.  Courts, for example, would not be able to enjoin private land owners or other third parties from violating the ESA unless the FWS could prove that jeopardy to a species would result.  To that end, the suggestion that irreparable harm requires a showing of jeopardy to an entire species contravenes the mandates of the ESA, which protect individual members of an endangered species as well as ensure the existence of the endangered species:

> In keeping with Congress's stated purpose to protect wildlife, the ESA prohibits federal agencies from taking any action that is 'likely to jeopardize the continued existence of any endangered species or threatened species," 16 U.S.C. § 1536(a)(2), and prohibits any person, including a governmental agency, from "taking" any individual member of a threatened or endangered species population, see 16 U.S.C. § 1538(a)(1)(B) (endangered species).   Under these two provisions, the ESA operates to protect both the survival of entire populations of endangered or threatened

7

>   species and the survival of individual members of each such
>   species.

Mausolf v. Babbitt, 125 F.3d 661, 668 (8th Cir. 1997) (emphasis added).

Because endangered wolves in Wisconsin and Michigan will be unlawfully killed absent an injunction in this case, Plaintiffs have made the requisite showing of irreparable harm.[3]

## III. THE STATES' INTEREST IN LETHAL DEPREDATION CONTROL DOES NOT OUTWEIGH THE HARM CAUSED BY ILLEGAL TAKING OF ENDANGERED SPECIES

States have long touted their interest in reducing wolf-human conflicts as an excuse for implementing programs that kill wolves. See, e.g., Sierra Club v. Clark, 577 F. Supp. 783, 790 (D. Minn. 1984) (federal and state agencies claiming that the sport hunting of wolves is "needed to enhance the value of the wolf in the eyes of the public"). See also, Defenders of Wildlife v. Andrus, 627 F.2d 1238 (D.C. Cir. 1980) (addressing NEPA challenge to Alaska state program that authorized the aerial killing of approximately sixty percent of its wolf population). Courts have equally as long rejected the states' claimed interest in killing wolves as a basis for relaxing the strict congressional mandates of the ESA. See, e.g., Sierra Club v. Clark, 577 F. Supp at 790 (holding that regulations establishing a wolf sport-hunting season in Minnesota violate the ESA and rejecting the argument that such regulations were necessary to conserve the wolf in the long term), aff'd in relevant part, 755 F.2d 608 (8th Cir. 1985). See also Fund for Animals v. Turner, 1991 U.S. Dist. LEXIS 13426 at *21 (rejecting the FWS's argument that creating a limited hunt

---

[3] The FWS claims that Plaintiffs' claim of irreparable injury is "undermined by their delay in seeking emergency relief." See Mem. Op. at 17, n. 8. First, the necessity of enforcing the unambiguous mandates of the ESA does not depend on how quickly plaintiffs are able to seek judicial relief. Second, the FWS's argument is based on the FWS's incorrect contention that irreparable harm necessitates showing jeopardy to an entire species. Given that taking of individual wolves constitutes irreparable harm, the irreparable harm that will result absent an injunction is not diminished by any alleged delay.

of grizzly bears would in the long run promote conservation and recovery of the species by confining bears to their range and reducing bear-human conflicts).

The interests of the states in implementing depredation programs to kill wolves do not trump the unequivocal congressional mandate that prohibits the taking of endangered species absent a valid permit. Nor does the claimed need for wolf depredation control justify a free pass on compliance with the ESA's nondiscretionary procedural mandates. Congress has already "spoken in the plainest of words, making it abundantly clear that it has given the policy of conservation of endangered species the highest of priorities." American Rivers, 271 F. Supp. 2d at 261 (internal quotation marks omitted) (citing Tennessee Valley Authority v. Hill, 437 U.S. 153 (1978)). In Sierra Club v. Clark, the court acknowledged the need to adhere to the mandates of the ESA in the face of the Nation's sordid history of killing wolves:

> The wolf has long been depicted in story and song as a mysterious menace to man's very existence. This concept of the wolf has become engrained in our attitudes and approach to the wolf. As a result, we have been driven by an ethic which would lead to the wolf's extinction. But Congress has now mandated that each person who would slay the wolf must stay his hand. When Congress took cognizance of the fact that thousands of species of plants and animals had disappeared in past decades, and undertook to curb that desecration, it declared that the wolf had a value as an individual species in danger of extinction.

577 F. Supp at 790.

Moreover, the FWS's contention that it must be allowed to kill wolves in order to save wolves is unsubstantiated. In other words, there is no record evidence that illegal killing of wolves decreases upon implementation of lethal control programs. Even if the FWS could show that the lethal control is needed for the long-term conservation of wolves, the ESA provides no exemption from its Section 10(c) procedural requirements just because the "take" permit is necessary for conservation. If that were the standard, then the procedural mandates of Section

9

10(c) would become irrelevant, despite the statutory language making the procedures nondiscretionary, in every case where the FWS claimed to be doing its job.

IV.     AN INJUNCTION IS IN THE PUBLIC INTEREST

By enacting the ESA, Congress has already made the determination that prohibiting the taking of endangered species is in the public interest. See TVA v. Hill, 437 U.S. 153, 174 (1978) ("examination of the language, history, and structure of the [ESA] . . . indicates beyond a doubt that Congress intended endangered species to be afforded the highest priorities"). See also Federation of Japan Salmon Fisheries Coop. Ass'n, 679 F. Supp. at 49 (issuing injunction preventing take of marine mammals in accordance with unlawfully issued permits because Congress, in enacting the Marine Mammal Protection Act, has already determined that takings are harmful to the environment and that protection is in the public interest). By making the procedural requirements of Section 10(c) nondiscretionary, Congress has also determined that providing public notice and comment before the issuance of Section 10(a)(1)(A) permits is in the public interest.

The FWS concedes that there is a "high amount of public interest in wolf recovery in general." See Mem. Op. at 2. Despite this concession, and despite the fact that wolf conservation efforts have been the subject of public interest and controversy since the inception of the ESA, the FWS nonetheless ignored unambiguous statutory requirements that are designed to give the public a voice in wolf recovery decisions. Issuing a preliminary injunction for the sake of the public interest is even more necessary in this case, therefore, where the FWS utterly failed to provide any opportunity for public involvement before issuing permits that the FWS knew would be controversial and strike at the heart of the public's interest in wolf conservation.

The public's interest in notice and comment is not satiated simply because the FWS now contends that it is "in the process of taking steps to ensure that all interested parties are afforded

opportunity to comment." <u>See</u> Mem. Op. at 2. Allowing the public to comment on permits that have already been issued is not what Section 10(c) requires. The mere allegation that the FWS is "taking steps" to involve the public after being confronted with its intentional disregard for public input is nothing more than a hollow gesture. The opportunity to comment <u>before</u> permits are issued enhances the quality of agency decision-making by ensuring that the agency is considering the full breadth of perspective and knowledge before making its decision.

     Here, the FWS has already issued permits without public input and now suggests that it can simply allow the public to comment while it continues its activities under those unlawfully issued permits. The FWS treats public comment as a mere formality, not even pretending that the public's input would actually be considered in the agency's decision to issue permits to the Wisconsin DNR and Michigan DNR. Under such circumstances, it is imperative that the Court uphold Congress's intent in enacting the nondiscretionary procedural mandates of Section 10(c) by ensuring that the public is afforded a genuine opportunity to comment on these controversial permits.

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Plaintiffs' Memorandum in Support of the Motion for Preliminary Injunction filed on August 24, 2005, this Court should issue a preliminary injunction preventing the taking of any wolves under the Section 10(a)(1)(A) permits unlawfully issued to the Wisconsin DNR and Michigan DNR.

Dated:  September 12, 2005

/s/
Jason C. Rylander, DC # 474995
**Defenders of Wildlife**
1130 Seventeenth Street, NW
Washington, D.C. 20036-4604
jrylander@defenders.org
(202) 682-9400

Brian B. O'Neill, MN # 82521
boneill@faegre.com
Richard A. Duncan, MN # 192983
rduncan@faegre.com
Elizabeth H. Schmiesing, MN # 229258
eschmiesing@faegre.com
Colette B. Routel, MN # 0313336
croutel@faegre.com
Sanne H. Knudsen, MN # 0344552
sknudsen@faegre.com
**FAEGRE & BENSON LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)

Attorneys for Plaintiffs Defenders of Wildlife, American Lands Alliance, Animal Protection Institute, Center for Biological Diversity, Friends of Animals and Their Environment ("FATE"), Help Our Wolves Live ("HOWL"), The Humane Society of the United States, Indigenous Environmental Network, Klamath Forest Alliance, Minnesota Wolf Alliance, RESTORE: The North Woods, Sierra Club, Wildlands Project.

M1:1245521.05