# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

Defenders of Wildlife, American Lands
Alliance, Animal Protection Institute, Center
for Biological Diversity, Friends of Animals
and Their Environment ("FATE"), Help Our
Wolves Live ("HOWL"), The Humane Society
of the United States, Indigenous
Environmental Network, Klamath Forest
Alliance, Minnesota Wolf Alliance,
RESTORE: The North Woods, Sierra Club,
and the Wildlands Project,

        Plaintiffs,

v.

Gale Norton, Secretary of the Interior, United
States Department of the Interior, Matthew J.
Hogan, Acting Director of the United States
Fish and Wildlife Service, and United States
Fish and Wildlife Service,

        Defendants.

**Civ. File No: 1:05CV-01573-ESH**

---

## AFFIDAVIT OF SANNE H. KNUDSEN

State of Minnesota   )
                ) ss.
County of Hennepin  )

Sanne H. Knudsen, being duly sworn states:

    1.    I am an attorney at Faegre & Benson LLP, and I am one of the attorneys

representing the plaintiffs in the above captioned matter.  I make this affidavit of my personal

knowledge.

2.      Attached hereto as **Exhibit H** is a true and correct copy of <u>National Wildlife</u>

<u>Federation v. Norton</u>, No. 1:03-CV-340, slip. op. (D. Vt. August 19, 2005).

Subscribed and sworn to before me
this ___th day of September, 2005.

Notary Public
Minnesota
My Commission Expires _January 31, 2010_

M1:1246098.01

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

NATIONAL WILDLIFE FEDERATION,           :
VERMONT NATURAL RESOURCES COUNCIL, :
MAINE WOLF COALITION,                   :
ENVIRONMENTAL ADVOCATES OF NEW          :
YORK, and MAINE AUDUBON SOCIETY,        :
         Plaintiffs,                    :
                                        :
             v.                         :     File No. 1:03-CV-340
                                        :
GALE NORTON, SECRETARY OF THE           :
INTERIOR, UNITED STATES DEPARTMENT :
OF THE INTERIOR and STEVEN              :
WILLIAMS, DIRECTOR, UNITED STATES       :
FISH and WILDLIFE SERVICE,              :
         Defendants.                    :

OPINION AND ORDER
(Papers 27 and 33)

In April 2003, the United States Fish and Wildlife Service ("FWS") issued its Final Rule to Reclassify and Remove the Gray Wolf from the List of Endangered and Threatened Wildlife in Portions of the Conterminous United States. 68 Fed. Reg. 15804 (April 1, 2003) ("Final Rule"). In the Final Rule, the FWS reclassified the gray wolf under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544 (2000), from endangered to threatened in the newly created Eastern and Western Distinct Population Segments ("DPSs"). The third DPS, the Southwestern DPS, retains its endangered status.

Plaintiffs National Wildlife Federation, Vermont Natural Resources Council, Maine Wolf Coalition, Environmental Advocates

1

of New York, and Maine Audubon Society, filed this action for declaratory and injunctive relief against defendants Gale Norton, in her official capacity as Secretary of the United States Department of the Interior, the United States Department of the Interior, and Steven Williams, Director of the United States Fish and Wildlife Service.[1]  Plaintiffs claim defendants violated the ESA and the Administrative Procedure Act, 5 U.S.C. §§ 553-559; 701-706 (2000) ("APA").

The case is before this Court on the parties' cross motions for judgment[2] (Papers 27 and 33).  For the reasons set forth below, plaintiffs' motion for judgment is GRANTED and defendants' motion for judgment is DENIED.

<u>BACKGROUND</u>

I.    THE ENDANGERED SPECIES ACT

The Endangered Species Act is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  <u>Tenn. Valley Auth. v. Hill</u>, 437 U.S. 153, 180 (1978).  Congress enacted the ESA "to provide a means

---

[1] In addition to the governmental defendants, Safari Club International Foundation filed an Amicus Curiae brief (Paper 66) in support of the Final Rule.

[2] The dispositive motions in this matter are more appropriately called motions for judgment because a "motion for summary judgment [under Fed. R. Civ. P. 56] makes no procedural sense when a district court is asked to undertake judicial review of agency action." <u>MRCA Information Servs. v. United States</u> 145 F. Supp. 2d 194, 195 n.3 (D. Conn. 2000).

2

whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species." 16 U.S.C. § 1531(b). "The plain intent of Congress in enacting th[e] statute was to halt and reverse the trend toward species extinction, whatever the cost." Id. at 184.

The ESA requires the Secretary to protect "species" – defined to include any subspecies of fish, wildlife, or plants, and any distinct population segment of any species of vertebrate fish or wildlife. Id. at § 1532(16). An endangered species is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species is a "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. at § 1532(20).

The Secretary is charged with determining whether a species should be listed as threatened or endangered based upon five statutorily prescribed factors. 16 U.S.C. § 1533(a)(1) (collectively referred to as "listing factors").[3] Each factor is equally important and a finding by the Secretary that a species

---

[3] The listing factors are: (1) the present or threatened destruction, modification, or curtailment of its habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) disease or predation; (4) the inadequacy of existing regulatory mechanisms; or (5) other natural or manmade factors affecting its continued existence. 16 U.S.C. § 1533(a)(1).

is negatively affected by just one of the factors warrants a non-discretionary listing as either endangered or threatened.  See 50 C.F.R. § 424.11(c).  The same five factors are used to determined whether threats to the species have been diminished or removed to the point that downlisting or delisting is appropriate.  The FWS shall make listing determinations "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).

The ESA makes it unlawful for any person to "take any [endangered] species within the United States."  16 U.S.C. § 1538(a)(1)(B).  The term "take" means to kill, harass, hunt, wound, trap, capture, collect, or harm a species.  16 U.S.C. § 1532 (19).  Under ESA section 4(d), 16 U.S.C. § 1533(d), the FWS can adopt rules that allow the taking of threatened species under certain circumstances.

To fulfill its goals of species preservation, the ESA requires the Secretary to develop and implement recovery plans under its duty to conserve.  16 U.S.C. § 1533(f).  Although the Act does not define "recovery," FWS has essentially defined the term to mean conservation, the use of "all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this [Act] are no longer necessary."  Id. at § 1532(3); see also 50 C.F.R. § 402.02 (2003).

4

II.   FACTUAL BACKGROUND

The gray wolf (*Canis Lupus*) is the largest wild member of the dog family, and is primarily a predator of medium and large animals.  Final Rule at 15804.  Gray wolves once ranged throughout most of North America, but human intolerance has extirpated, or destroyed, the gray wolf from over 95% of its historic range.  Final Rule at 15805.  The FWS first listed the gray wolf as endangered in 1967 pursuant to the Endangered Species Preservation Act of 1966, Pub. L. No. 89-669, §§ 1-3, 80 Stat. 926 (repealed 1973).  In 1973, the year the Endangered Species Act was enacted, it is likely that only several hundred wolves remained.  Id.

FWS's Proposed Rule designates four DPSs – a Western Great Lakes DPS, a Western DPS, a Northeastern DPS, and a Southwestern DPS – and downlists all of the DPSs except the Southwestern DPS from endangered to threatened.  Factors cited in support of proposing the Northeastern DPS were the presence of potentially suitable, although isolated, wolf habitat in Maine, Vermont, New Hampshire, and New York, and the possibility that gray wolves might disperse from neighboring areas of Canada.  Proposed Rule at 43456.  The Proposed Rule requested public comment specifically on "the potential for recovery of gray wolves in the northeastern United States," and "[a]dditional information

5

concerning the range, distribution, population size, and
population trends" of gray wolves, generally.  Id. at 43491.

The Final Rule changed the classification of the gray wolf
under the ESA by creating three DPSs – an Eastern DPS,[4] a Western
DPS, and a Southwestern DPS.  The Final Rule reclassified gray
wolves in the Eastern and Western DPSs from endangered to
threatened but retained the gray wolf's status as an endangered
species in the Southwestern DPS.  Final Rule at 15857.  Under the
ESA's Section 4(d) rules, the Final Rule also permits "take" of
depredating wolves by private parties in the Eastern and Western
DPSs.  Therefore, any wolf can be killed within one mile of the
depredation site in Wisconsin and Michigan, and within 4 miles in
the remaining states in the Eastern DPS.  Final Rule at 15863-68.

In the Final Rule, the federal defendants state there exists
a significant, continuing scientific debate concerning both the
species and subspecies identity of the large canid that
historically occupied New England, which may never have been the
gray wolf.  Final Rule at 15805; AR Doc. 967F at 14014.

Therefore, "in the absence of any evidence of a current gray
wolf population in the Northeast, and in light of new doubts
about whether the gray wolf historically occupied the Northeast,

---

[4] The Eastern DPS consists of gray wolves in North Dakota,
South Dakota, Nebraska, Kansas, Minnesota, Iowa, Missouri,
Wisconsin, Illinois, Michigan, Indiana, Ohio, Pennsylvania, New
Jersey, New York, Connecticut, Rhode Island, Massachusetts,
Vermont, New Hampshire, and Maine.  Final Rule at 15818, 15862.

the FWS concluded, based upon its interpretation of the ESA and
its DPS policy, that it could not finalize its proposal to
designate a separate Northeastern DPS." Fed. Defs. Motion for
Judgment (Paper 33 at 20); Final Rule at 15805-06.  In light of
defendants' findings, FWS formed the Eastern DPS by combining the
Western Great Lakes DPS with the Northeastern DPS.  Plaintiffs
claim defendants' Final Rule violates the ESA and the APA because
they: (1) failed to provide the public with adequate notice and
opportunity for comment on the Eastern DPS; (2) designated DPSs
that violate the Act; (3) arbitrarily determined that the gray
wolf is not at risk in a significant portion of its range; and
(4) failed to prepare a national recovery plan for the gray wolf
as listed.

<u>DISCUSSION</u>

I.    STANDING

     Plaintiffs consist of 5 environmental and conservation
organizations seeking to protect the gray wolf.  If an
organization seeks to bring suit on behalf of its members, it
must show that "(a) its members would otherwise have standing to
sue in their own right; (2) the interests it seeks to protect are
germane to the organization's purpose; and (3) neither the claim
asserted nor the relief requested requires the participation of
individual members in the lawsuit." <u>Hunt v. Wash. State Apple
Adver. Comm'n</u>, 432 U.S. 333, 343 (1977).  Requirement (1) of

associational standing is met if "any one" of the association's members satisfies the Article III standing requirements. Plaintiffs meet the second and third prong of the representational standing requirements, and therefore, the Court will focus on the contested issue of Article III standing.

To satisfy the Constitution's Article III standing requirements, a party must show that he "(1) suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth v. Laidlaw Envtl. Servs. Inc., 528 U.S. 167, 180-81 (2000).

The "injury in fact" requirement in an environmental case is satisfied if a party adequately shows that he has an aesthetic or recreational interest in a particular place or animal, and that interest is impaired by a defendant's conduct. Id. 528 U.S. at 183. Plaintiffs' members have an aesthetic and recreational interest in observing the gray wolf because they are involved in activities in and around the gray wolf's habitat and have devoted substantial amounts of time in support of wolf recovery and in pursuit of the wolf throughout the Northeast. Even though the Declarants have not actually seen a gray wolf, actual observation

8

of a rare, endangered species is not the test for standing in ESA cases, and therefore, plaintiffs have demonstrated "injury in fact."  See Southwest Ctr. for Biological Diversity v. Clark, 90 F. Supp. 2d 1300, 1307 (D.N.M. 1999).

In addition, plaintiffs' Declarants Walter Pepperman and Margaret Struhsacker participated in the administrative process at issue here.  "A participant in the agency's decisional processes is actually and particularly injured by the agency's disregard of its statutory duty."  Portland Audubon Soc'y v. Endangered Species Comm., 984 F.2d 1534, 1537 n.4 (9th Cir. 1993); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 573 n.7 (1992) ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy").

FWS claims the Final Rule is not traceable to plaintiffs' alleged injury because gray wolf recovery has been achieved in the eastern United States by restoring the species to its core recovery area of Minnesota, Wisconsin, and Michigan.  Final Rule at 43672-73.  "We do not need to recover the wolf in other areas of the eastern United States to delist the EDPS."  Id.  Because the Final Rule focuses its recovery actions upon the Western Great Lakes area of the Eastern DPS and eliminates protection and recovery efforts necessitated by a Northeastern DPS, plaintiffs'

injuries are fairly traceable to defendants' actions. Additionally, plaintiffs' injuries would be redressed by a favorable decision from this Court because the FWS would have to reconsider the Final Rule.  See Sierra Club v. Glickman, 156 F.3d 606, 616 (5th Cir. 1998).

II.  STANDARD OF REVIEW

Under Section 706 of the APA, courts must set aside agency actions that are arbitrary, capricious, or contrary to the ESA. 5 U.S.C. § 706; Southwest Ctr. for Biodiversity v. U.S. Forest Serv., 307 F.3d 964, 975 (9th Cir. 2002).  To determine whether the agency action was arbitrary and capricious, courts must decide whether the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 105 (1983).

An agency action must be reversed when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

When reviewing agency action, the district court "sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether the Secretary's [action] was factually flawed." <u>Marshall County Health Care Auth. v. Shalala</u>, 988 F.2d 1221, 1225 (D.C. Cir. 1993). Review under the arbitrary and capricious standard is to be "searching and careful," but "narrow," and a "court is not empowered to substitute its judgment for that of the agency." <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 416 (1971).

III. NOTICE AND COMMENT REQUIREMENT OF THE APA[5]

The APA requires that "[g]eneral notice of a proposed rulemaking . . . shall include . . . either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). A final rule need not be identical to the proposed rule, but it must be a "logical outgrowth" of the proposed regulation. <u>Kooritzky v. Reich</u>, 17 F.3d 1509, 1513 (D.C. Cir. 1994); <u>American Fed'n of Labor and Congr. of Indus. Orgs. v. Donovan</u>, 757 F.2d 330, 338 (D.C. Cir. 1985) (hereinafter "<u>AFL-CIO</u>"). If the "final rule deviates too

---

[5] Defendants argue plaintiffs' claim under § 553 of the APA is not set forth in their Complaint and should be dismissed on that ground alone. In their Complaint, however, plaintiffs sought declaratory and injunctive relief for violation of the "Administrative Procedures Act, 5 U.S.C. §§ 553-559, 701-706." Fed. R. Civ. P. 8(f) sets forth liberal notice pleading rules, and the claim should not be dismissed on this ground.

sharply from the proposal, [however], affected parties will be deprived of notice and an opportunity to respond to the proposal." Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 547 (D.C. Cir. 1983).

The Proposed Rule clearly stated that the FWS intended to create a Northeastern DPS and downlist the gray wolf from endangered to threatened.  Proposed Rule at 43472-73.  The FWS specifically requested comments on the Proposed Rule relating to "(5)[i]nformation concerning the potential for recovery of gray wolves in the northeastern United States, and the potential involvement of the Service in such recovery activities," and "(9) [a]ppropriateness of authorizing take in the Northeastern DPS in accordance with an approved State or Tribal Conservation Plan." Id. at 43491.  The Final Rule abandoned creating the Northeastern DPS and opted to combine the Northeastern and Western Great Lakes DPSs into a larger Eastern DPS.

"Unfairness results unless persons are 'sufficiently alerted to likely alternatives' so that they know whether their interests are 'at stake.'" Spartan Radiocasting Co. v. FCC, 619 F.2d 314, 321 (4th Cir. 1980) (quoting South Terminal Corp. v. EPA, 504 F.2d 646, 659 (1st Cir. 1974)).  Defendants argue adequate notice was given because the FWS noted in the Proposed Rule it considered and rejected the alternative of "reclassifying a

larger or smaller DPS in the eastern United States." Proposed
Rule at 43475.

In the Proposed Rule, the FWS recited its rationale for
creating a Northeastern DPS instead of a "larger or smaller DPS;"
it then can hardly be said the FWS apprised interested parties of
its intention to abandon the Northeastern DPS in favor of a
larger Eastern DPS  Id.; see also Nat'l Black Media Coalition v.
Fed. Communications Comm'n, 791 F.2d 1016, 1021, 1023 (2d Cir.
1986) ("If this were enough notification of such intention, an
agency could simply propose a rule and state that it might change
that rule without alerting any of the affected parties to the
scope of the contemplated change, or its potential impact and
rationale, or any other alternatives under consideration"); AFL-
CIO, 757 F.2d at 338-39 ("A determination of whether notice [is]
adequate . . . turns, then, on an examination of the notice . . .
provided in relation to the final rule which was ultimately
adopted.").

Furthermore, the Administrative Record ("AR") reveals the
FWS acknowledges the Final Rule is a stark departure from the
Proposed Rule.  Several of those involved in the rulemaking
within the FWS argued for developing a new proposal and taking
more public comment on the disputed issues.  AR Docs. 698; 714;
717; 726; 724; 723; 765; 768.  In fact, Ronald L. Refsnider, the
primary author of the Proposed and Final Rules, FWS Region 3,

13

proposed publishing "a 6-month extension for the gray wolf

proposal in July [2001], based upon internal FWS disagreement . .

. . The extension notice would open a comment period (30-45

days) and ask for information on 8 or so issues that would help

with [FWS's] decision on the NE DPS." AR Doc. 708; see also AR

Docs. 698; 707 at 10057; 708 at 10066; 735 at 10159. The FWS

opted, however, to finalize the rule without an additional

comment period regarding the elimination of the Northeastern DPS

and ultimate creation of the Eastern DPS. The internal concern

about an additional comment period points out the significant

changes made in the Final Rule without notice to the public.

Defendants argue the public commented extensively on the

creation of a Northeastern DPS and the establishment of a larger

DPS for the Eastern United States. Although certain comments

argued against the formation of a Northeastern DPS, no comments

specifically addressed the creation of an Eastern DPS.

Furthermore, "[a]s a general rule, [an agency] must *itself*

provide notice of a regulatory proposal. Having failed to do so,

it cannot bootstrap notice from a comment." AFL-CIO, 757 F.2d at

340 (emphasis in original); see also Nat'l Black Media, 791 F.2d

at 1023 ("[T]he comments of other interested parties do not

satisfy an agency's obligation to provide notice.").

Because the Final Rule deviates substantially from the

Proposed Rule, defendants failed to provide the public with

adequate notice and opportunity for comment on the Eastern DPS, in violation of 5 U.S.C. § 553.

IV.  DISTINCT POPULATION SEGMENTS

A.  DPS Policy

The definition of "species" includes "any distinct population segment of any species."  16 U.S.C. § 1532(16).  The ESA does not define "distinct population segment" ("DPS"), nor is it a term used in scientific literature.  In 1996, FWS and National Marine Fisheries Service jointly published the Policy Regarding the Recognition of Distinct Vertebrate Population ("DPS Policy") to clarify their interpretation of this term "for the purposes of listing, delisting, and reclassifying" species under the ESA."  61 Fed. Reg. 4722.[6]  The DPS Policy "allows the Services to protect and conserve species . . . before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range."  61 Fed. Reg. at 4725.

Under the DPS Policy, the FWS evaluates three elements regarding the identification of a possible DPS: (1) the discreteness of the population segment in relation to the remainder of the taxon to which it belongs;[7] (2) the significance

---

[6] Plaintiffs do not challenge the validity of the DPS Policy, 61 Fed. Reg. 4722 (Feb. 7, 1996).

[7] A population is considered discrete if it: (1) requires marked separation as a consequence of physical, physiological, ecological, or behavioral factors; or (2) is "delimited by

15

of the population's segment to the taxon;[8] and (3) the
conservation status of the population segment in relation to the
ESA's standards for listing.  DPS Policy at 4725.  Plaintiffs
argue the Secretary's listing of the Eastern DPS and abandonment
of the Northeastern DPS violates DPS Policy, the ESA, and the
APA.

Defendants contend the Eastern DPS is biologically based and
supported by DPS Policy and furthermore, that they are entitled
to great deference under the principles announced in Chevron
U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-884
(1984).  That a court owes deference to an agency's policy does
not mean the agency has unbridled discretion in creating and
implementing policy.  Agencies must comply with their own
procedural rules and the policy selected by the agency must be
reasonable in light of the statutory scheme.  Id. at 884.  A court

_____

international boundaries when these coincide with differences in
the management, status, or exploitation of a species" that are
significant in light of inadequacy of existing regulatory
mechanisms--the fourth ESA listing factor.  DPS Policy at 4723,
4725.

[8] A population is considered significant if: (1) the
discrete population has persisted in an ecological setting
unusual or unique for the taxon; (2) there exists evidence that
loss of the discrete population segment would result in a
significant gap in the range of a taxon; (3) there exists
evidence that the discrete population segment represents the only
surviving natural occurrence of a taxon that may be more abundant
elsewhere as an introduced population outside its historic range;
or (4) there exists evidence that the discrete population segment
differs markedly from other populations of the species in its
genetic characteristics.  DPS Policy at 4723, 4725.

need not accept an agency's interpretation of its own regulations
if that interpretation is inconsistent with the wording of the
regulation or inconsistent with the statute under which the
regulations were promulgated.  United States v. Larionoff, 431
U.S. 864, 872 (1977); 60 Key Centre v. Administrator of Gen.
Servs. Admin., 47 F.3d 55, 58 (2d Cir. 1995).

    B.   The Secretary Designated DPSs That Violate DPS Policy
       And The ESA

The DPS Policy allows the FWS to assign varying conservation
statuses to different populations of a species and requires the
DPS to be "markedly separate from other populations of the same
taxon."  DPS Policy at 4725; see also Nat'l Ass'n of Home
Builders v. Norton, 340 F.3d 835, 842 (9th Cir. 2003).
Plaintiffs contend the record does not support a conclusion that
the wolves in the newly-minted Eastern DPS are "markedly
separated" from wolves in the other DPSs as a "consequence of
physical, physiological, ecological, or behavioral factors."  DPS
Policy at 4725.  Furthermore, plaintiffs contend the creation of
the Eastern DPS violates the Congressional directive that FWS use
discrete population segments "sparingly and only when the
biological evidence warrants it."  S. Rep. No. 96-151, at 7
(1979).

Defendants respond that the DPSs are based upon sound
biology as each of the three DPSs encompasses a gray wolf

population, its recovery areas, the locations of all documented dispersers, the most likely location of future dispersers, and a wide buffer between the core area and the boundary of the DPS to ensure that it is markedly separate from the other DPSs.  Final Rule at 15860.

In the Proposed Rule, FWS acknowledged the Western Great Lakes, the Southwest and Northern Rockies DPSs are discrete because they are "each being repopulated by wolves of distinct morphological characteristics which may represent different gray wolf subspecies." Proposed Rule at 43473.  In its Final Rule, FWS states the wolves in the Northeast and southeastern Canada are a different population than the wolves in the Midwest. Final Rule at 15810, 15814.  By combining the Northeastern DPS with the Western Great Lakes DPS, two admittedly distinct gray wolf populations, FWS appears to be classifying the gray wolf based upon geography, not biology.  Although defendants state that in delineating the DPSs, the agency took into account geographical barriers to dispersal like rivers and long stretches of desert that might be difficult for a wolf to traverse, they did not use a river, mountain range, or other geographic feature to delineate the three DPSs.  See Final Rule at 15859-60.

This geographical approach, the idea of using "infra national boundaries as a basis for recognizing discrete entities for delisting," was rejected by the FWS when it adopted the DPS

Policy.  DPS Policy at 4724.  Although this approach was
attractive to the FWS, "[p]articularly when applied to the . . .
reclassification of a relatively widespread species for which a
recovery program is being successfully carried out in some
states," it is "inappropriate as a focus for a national program."
Id.

    C.    <u>The Secretary's Designation Of An Eastern DPS Violated
        DPS Policy And The ESA</u>

    Defendants additionally contend that they had no choice in
designating the Eastern DPS.  Because a wolf population must
exist for the Secretary to designate a DPS, the uncertainty over
the existence of a population in the Northeast and its genetic
makeup were primary obstacles to creating a Northeastern DPS.
Final Rule at 15814, 15829, 15859.  This same uncertainty,
however, did not pose an obstacle for defendants to lump the
Northeast in with wolves in the Midwest to create the Eastern
DPS.

    Defendants argue they cannot create "non-DPS remnant"
endangered species areas outside of the DPS, and therefore, they
were left with only two options: (1) delist the Northeast for
extinction or original listing error, or (2) incorporate that
geographic area into the nearest DPS because "listing
distinctions below that of subspecies or a DPS of a species are
not allowed under the ESA."  <u>Alsea Valley Alliance v. Evans</u>, 161

19

H-19

F. Supp. 2d 1154, 1162 (D. Or. 2001).[9] Plaintiffs argue,
however, that the ESA and DPS Policy do not force a choice, so
defendants are not prevented from maintaining its nationwide
species listing and establishing DPSs in areas where FWS needs
the kind of flexibility the DPS designation provides.

The ESA allows defendants to provide varying levels of
protection based upon biological evidence. Defenders, 258 F.3d
at 1144-45; Friends of the Wild Swan, Inc. v. U.S. Fish &
Wildlife Serv., 12 F. Supp. 2d 1121, 1133 (D. Or. 1997) ("Listing
of population segments is a proactive measure to prevent the need
for listing a species over a larger range – not a tactic for
subdividing a larger population the FWS has already determined .
. . warrants listing throughout a larger range.") (emphasis in
original). "The FWS does not have to list an entire species as
endangered when only one of its populations faces extinction."
Nat'l Ass'n of Home Builders, 340 F.3d at 842.

Nowhere in the ESA is the Secretary prevented from creating
a "non-DPS remnant" designation, especially when the remnant area
was already listed as endangered. In fact the Secretary's
determination that she is forbidden to create "non-DPS remnant"
areas conflicts with the overarching purpose of the ESA – protect
a species and its habitat from extinction. See 15 U.S.C. § 1531.

---

[9] Alsea holds the FWS cannot exclude portions of a DPS from
listing a species. Once a DPS is formed, it is treated uniformly
throughout the DPS.

20

The FWS simply cannot downlist or delist an area that it previously determined warrants an endangered listing because it "lumps together" a core population with a low to non-existent population outside of the core area.  Because the FWS expanded the boundaries of the DPS in the Final Rule, it is bypassing the application of the ESA in the non-core population areas. Therefore, the FWS's application of DPS Policy is "inconsistent with the statute under which the regulations were promulgated." Mines v. Sullivan, 981 F.2d 1068, 1070 (9th Cir. 1992).

The Court finds the Eastern DPS designation to be in violation of DPS Policy and the ESA, and therefore, the Final Rule is vacated and remanded for reconsideration by the FWS. Because the DPS designations have been vacated, the issue of whether FWS arbitrarily eliminated the Northeastern DPS does not need to be addressed.

V.    THE SECRETARY ARBITRARILY DETERMINED THE GRAY WOLF IS NOT AT RISK IN A SIGNIFICANT PORTION OF ITS RANGE

When listing, reclassifying or delisting a species, the Secretary must determine whether a species is either endangered or threatened due to any of the five factors listed in the ESA. 16 U.S.C. § 1533(a).  A species is endangered when it is "in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  The phrase "significant portion of its range" is ambiguous, see Defenders of Wildlife v.

21

Norton, 258 F.3d 1136, 1141 (9th Cir. 2001), and therefore, the
agency's interpretation of the phrase is entitled to deference
unless it is unreasonable. Chevron, 467 U.S. at 843. Deference
"is not due when the [agency] has apparently failed to apply an
important term of its governing statute. [The Court] cannot defer
to what [it] cannot perceive." Int'l Longshoremen's Ass'n, AFL-
CIO v. Nat'l Mediation Bd., 870 F.2d 733, 736 (D.C. Cir. 1989).

    Plaintiffs argue the FWS failed to consider what constitutes
a significant portion of the range of the three new DPSs and
relied on factors which Congress has not intended it to consider
when it determined the gray wolf was threatened, not endangered,
in the Eastern and Western DPSs. Therefore, the Final Rule was
an arbitrary and capricious application of the ESA's undefined
term, "a significant portion of the range."

    Defendants contend they carefully considered the term
"significant portion of its range" and other issues raised during
the comment period on the Proposed Rule while meeting at
Marymount University on November 30, 2000, and used that
definition throughout the Final Rule. FWS defined "significant
portion of its range" as "that area that is important or
necessary for maintaining a viable, self-sustaining, and evolving
representative population or populations in order for the taxon
to persist into the foreseeable future." AR Doc. 663 at 9924.
FWS determined these areas are not significant to the species as

22

H-22

a whole, and therefore, it limited the significant portion of the wolf's range and the application of the five ESA § 4(a)(1) listing factors to the "current status of, and threats faced by, the existing wolf populations within" the Western Great Lakes and Northern Rockies.  Final Rule at 15857, 15810.

In interpreting the term, a "significant portion of its range," the Ninth Circuit held "a species can be extinct throughout a significant portion of its range if there are major geographical areas in which it is no longer viable but once was." Defenders, 258 F.3d at 1145.  The Court in Defenders recognized that Congress consciously moved away from the weaker predecessor statutes in its current promulgation of the ESA, and "[t]he new definition's expansion to include species in danger of extinction 'in any portion of its range' represented 'a significant shift in the definition in existing law which considers a species to be endangered only when it is threatened with worldwide extinction.'" Defenders, 258 F.3d at 1144 (emphasis in original); see also Defenders of Wildlife v. Sec'y, United States Dep't of Interior, 354 F. Supp. 2d 1156, 1166 (D. Or. 2005) (hereinafter "Defenders (Gray Wolf)").; H.R. Rep. No. 41293 (1973).

In applying the Defenders test for "significant portion of its range," the District Court for the District of Columbia held that FWS's decision to list the lynx as threatened, instead of endangered, was arbitrary and capricious.  Defenders of Wildlife

23

H-23

v. Norton, 239 F. Supp. 2d 9 (D.D.C. 2002) ("Defenders (Lynx)")
(remedy vacated on other grounds by Defenders of Wildlife v.
Norton, 2004 U.S. App. LEXIS 7502 (D.C. Cir., Mar. 3, 2004)).  In
the Final Rule, the FWS declared that "'collectively, the
Northeast, Great Lakes, and Southern Rockies do not constitute a
significant portion of the range of the DPS,'" and "'do [] not
contribute substantially to the persistence of the contiguous
United States DPS.'" Id. at 16 (quoting 65 Fed. Reg 16006-67).[10]
The Court concluded that FWS's focus upon "only one region of the
Lynx's population--the Northern Rockies/Cascades--to the
exclusion of three-quarters of the Lynx's historical regions is
antithetical to the ESA's broad purpose to protect endangered and
threatened species," and therefore, is arbitrary and capricious.
Id. at 19, 21.

In this case, the FWS used the "Marymount definition" to
limit the "significant portion of its range" to areas that ensure
the validity of the DPS.  Regarding the Eastern DPS, FWS
explained, "the progress towards recovery . . . within the
western Great Lakes States demonstrates that the species is not
in danger of extinction in any significant portion of its entire
range within the DPS. We therefore conclude that gray wolves are

---

[10] The largest, and possibly only remaining, Lynx population
in the contiguous United States is in the Northern Rocky
Mountains/Cascade region, and it is believed the Lynx population
has been extirpated in its historically-occupied Northeast, Great
Lakes and Southern Rocky Mountain regions.  Id. at 14.

24

no longer properly classified as endangered species in the

Eastern DPS." Final Rule at 15810.

The viability of this population, therefore, renders all

areas outside the Western Great Lakes region insignificant, even

though the FWS acknowledged in the Proposed Rule that there would

be "extensive and significant gaps" in the wolf's range without a

wolf population in the Northeast. Proposed Rule at 43473;

Defenders (Gray Wolf), 354 F. Supp. 2d at 1166. The Final Rule

makes all other portions of the wolf's historical or current

range outside of the core gray wolf populations insignificant and

unworthy of stringent protection. The Secretary's conclusion is

contrary to the plain meaning of the ESA phrase "significant

portion of its range," and therefore, is an arbitrary and

capricious application of the ESA.

VI.  RECOVERY PLAN

Plaintiffs have charged the FWS with violating § 4(f) and §

7(a)(1) of the ESA, 16 U.S.C. § 1533(f) and 16 U.S.C. §

1536(a)(1) respectively, by failing to issue a national recovery

plan for the gray wolf. Defendants argue their claims must fail

because the FWS has fully complied with its obligation under §

4(f) by establishing three recovery plans for the gray wolf.

Additionally, defendants assert § 7(a)(1) does not apply to the

FWS's administration of the ESA.

25

A.    Application of § 7(a)(1) To The FWS

Section § 7(a)(1) provides that "[t]he Secretary shall
review other programs administered by him and utilize such
programs in furtherance of the purposes of this Act . . . by
carrying out programs for the conservation of endangered and
threatened species listed pursuant to Section 4 of this Act."  16
U.S.C. § 1536(a)(1).  Defendants claim the only logical reading
of § 7(a)(1) is to interpret it as applying to federal programs
other than the FWS's administration of the Endangered Species
Act.  The language of § 7(a)(1), however, conflicts with that of
§ 2(c)(1), which provides that "[i]t is further declared to be
the policy of Congress that all Federal departments and agencies
shall seek to conserve endangered species and threatened
species."  Id. at § 1531(c)(1).  In reconciling the conflicting
language, "sections 2(c)(1) and 7(a)(1) can be read consistently
and without conflict. . . ."  Pyramid Lake Paiute Tribe v. U.S.
Dep't of Navy, 898 F.2d 1410, 1416-17 n.15 (9th Cir. 1990).  In
interpreting language in one section of a statute in conjunction
with language of other sections, this court strives to find a
reading that is consistent with the purposes of the entire
statute considered as a whole."  Id.  It is inconsistent with the
ESA to exempt the FWS from conservation efforts, and therefore, §
7(a)(1) applies to defendants.

26

H-26

B.    The Secretary Did Not Violate § 4(f)(1) Or § 7(a)(1)

Section 4(f)(1) of the ESA states that "the Secretary shall

develop and implement [recovery] plans for the conservation and

survival of endangered species and threatened species listed

pursuant to this section, unless he finds that such a plan will

not promote the conservation of the species.." 16 U.S.C. §

1533(f)(1). The FWS has developed three recovery plans for the

gray wolf – recovery plans in the eastern United States, Northern

Rocky Mountain states, and in the southwestern United States and

Mexico. Plaintiffs argue FWS's recovery plans are a "piecemeal

approach" to gray wolf recovery and, therefore, violate Sections

4(f)(1) and 7(a)(1) of the ESA.

The ESA "allows the Secretary broad discretion to allocate

scarce resources to those species would most likely benefit from

development of a recovery plan." Oregon Natural Res. Council v.

Turner, 863 F. Supp. 1277, 1283 (D. Or. 1994). In fact, the ESA

mandates the Secretary to "give priority to those endangered

species or threatened species, without regard to taxonomic

classification, that are most likely to benefit from such plans."

16 U.S.C. § 1533(f)(1)(A).

In the 1992-revised Eastern Timber Wolf Recovery Plan, one

of the Secretary's purported goals is to "maintain and re-

establish viable populations of the eastern timber wolf in as

much of its former range as possible." AR Doc. 1198, p. 29.

27

Although the vast majority of the recovery plan gives priority to wolf recovery in Minnesota, Michigan and Wisconsin, the Secretary additionally outlines a three-point plan to "re-establish [a] wolf population in Adirondack Mountains (New York), northwestern Maine/adjacent New Hampshire, and/or northeastern Maine." Id. at 35.

Because "[c]ourts should be particularly reluctant to second-guess agency choices involving scientific disputes that are in the agency's province of expertise," Browning-Ferris Indus. of South Jersey, Inc. v. Muszynski, 899 F.2d 151, 160 (2d Cir. 1990), the Secretary's decision to proceed with three recovery plans for the gray wolf rather than one comprehensive national plan must be afforded Chevron deference. See Chevron, 467 U.S. at 843.

CONCLUSION

The Final Rule does not comply with the ESA, DPS Policy, or the notice and comment provisions of the APA. For the reasons set forth herein, plaintiffs' motion for judgment is GRANTED and defendants' motion for judgment is DENIED. The Final Rule is vacated and remanded for reconsideration.

SO ORDERED.

Dated at Brattleboro, Vermont, this 19th day of August, 2005.

/s/ J. Garvan Murtha
J. Garvan Murtha
United States District Judge

28

H-28